IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

DAIMLER TRUCKS NORTH AMERICA LLC, *et al.*,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent,

NAVISTAR, INC.,

Intervenor.

On Petition for Review from the United States
Environmental Protection Agency

## INITIAL OPENING BRIEF FOR PETITIONERS

JULIE R. DOMIKE
WILLIAM F. LANE
ALEC C. ZACAROLI
KILPATRICK TOWNSEND & STOCKTON
  LLP
Suite 900
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 824-1418

*Counsel for Mack Trucks, Inc. and Volvo
Group North America, LLC*

February 22, 2013

CHRISTOPHER T. HANDMAN
R. LATANE MONTAGUE
SEAN MAROTTA
KATHRYN L. LANNON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5719

*Counsel for Daimler Trucks North
America LLC and Detroit Diesel
Corporation*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), Petitioners provide the following information:

## A.    PARTIES

1.    The following are parties in this Court:

a. <u>Petitioners</u>:  Daimler Trucks North America LLC; Detroit Diesel Corporation; Mack Trucks, Inc.; and Volvo Group North America, LLC.

b. <u>Respondent</u>:  United States Environmental Protection Agency.

c. <u>Intervenor</u>:  Navistar, Inc.

2.    a.  Daimler Trucks North America LLC is a manufacturer of heavy-duty trucks, medium-duty trucks, and specialized commercial vehicles.  It manufactures vehicles under the brand names of Freightliner, Western Star, and Thomas Built Buses.  Daimler Trucks is a wholly owned subsidiary of Daimler North America Corporation, which is 100 percent owned by Daimler AG.  Daimler AG is a publicly traded company listed on the Frankfurt and Stuttgart stock exchanges.

b.  Detroit Diesel Corporation manufactures heavy-duty diesel engines and provides products and services for their maintenance and repair.  Detroit Diesel is a wholly owned subsidiary of Daimler Trucks North America LLC,

which is a wholly owned subsidiary of Daimler North America Corporation, which is 100 percent owned by Daimler AG. Daimler AG is a publicly traded company listed on the Frankfurt and Stuttgart stock exchanges.

c. Mack Trucks, Inc. and Volvo Group North America, LLC are both corporations engaged in the manufacture and sale of heavy-duty diesel engines and/or heavy-duty on-highway trucks. Mack Trucks, Inc. and Volvo Group North America, LLC, are wholly owned by VNA Holding, Inc., which is wholly owned by AB Volvo of Gothenberg, Sweden. Renault S.A. has a greater than 10 percent ownership interest in AB Volvo. AB Volvo is a publicly traded company listed on the Stockholm stock exchange.

## B. RULING UNDER REVIEW

Petitioners challenge a Final Rule of the Environmental Protection Agency, which was published on September 5, 2012, and is set forth in the Federal Register as Nonconformance Penalties for On-Highway Heavy Heavy-Duty Diesel Engines, 77 Fed. Reg. 54,384 (Sept. 5, 2012).

## C. RELATED CASES

This case was previously before this Court as *Mack Trucks, Inc.* v. *EPA*, 682 F.3d 87 (D.C. Cir. 2012). This case is related to the pending case of *Daimler Trucks North America LLC* v. *EPA*, Nos. 12-1179 and 12-1270 (D.C. Cir.), which

challenges certificates of conformity issued under an Interim Final Rule that was

superseded by the Final Rule at issue in this proceeding.

Respectfully submitted,

/s/ Julie R. Domike

JULIE R. DOMIKE
WILLIAM F. LANE
ALEC C. ZACAROLI
KILPATRICK TOWNSEND & STOCKTON
  LLP
Suite 900
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 824-1412

*Counsel for Mack Trucks, Inc. and*
*Volvo Group North America, LLC*

/s/ Christopher T. Handman

CHRISTOPHER T. HANDMAN
R. LATANE MONTAGUE
SEAN MAROTTA
KATHRYN L. LANNON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5719

*Counsel for Daimler Trucks North America*
*and Detroit Diesel Corporation*

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES ..................................................................... i

TABLE OF AUTHORITIES ..............................................................vi

GLOSSARY ........................................................................................xi

JURISDICTIONAL STATEMENT ....................................................1

INTRODUCTION ...............................................................................2

ISSUES PRESENTED FOR REVIEW ...............................................5

STATUTES AND REGULATIONS.....................................................6

STATEMENT OF FACTS ..................................................................6

SUMMARY OF ARGUMENT ..........................................................20

STANDING........................................................................................23

STANDARD OF REVIEW ...............................................................24

ARGUMENT......................................................................................25

I.    EPA IMPROPERLY AMENDED THE SUBSTANTIAL-
      WORK REGULATIONS AND MADE OTHER KEY
      FINDINGS WITHOUT PROVIDING THE PUBLIC WITH
      ADEQUATE NOTICE AND OPPORTUNITY TO
      COMMENT...............................................................................25

      A.    EPA Cannot Justify Its Amended Substantial-Work
            Standard As A Logical Outgrowth Of The Proposed Rule ...............28

      B.    EPA's Alternative Finding That Navistar Still Must
            Engage In Substantial Work Was Not A Logical
            Outgrowth Of The Proposed Rule .....................................34

II.   THERE IS NO TECHNOLOGICAL LAGGARD ......................38

# TABLE OF CONTENTS—Continued

Page

III.  EPA's NCP CALCULATION DEPARTED FROM PAST
      AGENCY PRACTICE WITHOUT RATIONAL
      EXPLANATION .......................................................................................42

CONCLUSION ....................................................................................................48

CERTIFICATE OF COMPLIANCE

ADDENDA

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES:**

*Airmark* v. *FAA,*
758 F.2d 685 (D.C. Cir. 1985) ........................................................45

*Alaska Prof'l Hunters Ass'n* v. *FAA,*
177 F.3d 1030 (D.C. Cir. 1999) ......................................................31

*Am. Med. Ass'n* v. *United States,*
887 F.2d 760 (7th Cir. 1989)......................................................32, 33

*ARCO Oil & Gas Co.* v. *FERC,*
932 F.2d 1501 (D.C. Cir. 1991) ......................................................48

*Ass'n of Battery Recyclers, Inc.* v. *EPA,*
208 F.3d 1047 (D.C. Cir. 2000) ................................................21, 35

*Carr* v. *United States,*
130 S. Ct. 2229 (2010).....................................................................26

*City of Waukesha* v. *EPA,*
320 F.3d 228 (D.C. Cir. 2003) ........................................................34

*CSX Transp., Inc.* v. *Surface Transp. Bd.,*
584 F.3d 1076 (D.C. Cir. 2009) ......................................................30

*D&F Afonso Realty Trust* v. *Garvey,*
216 F.3d 1191 (D.C. Cir. 2000) ......................................................48

*Dillmon* v. *NTSB,*
588 F.3d 1085 (D.C. Cir. 2009) ......................................................43

\* *Envtl. Integrity Project* v. *EPA,*
425 F.3d 992 (D.C. Cir. 2005) ...........................................20, 29, 32

*FCC* v. *Fox Television Stations, Inc.,*
556 U.S. 502 (2009)........................................................................32

\* Authorities upon which we chiefly rely are marked with asterisks.

*Gen. Chem. Corp.* v. *United States*,
    817 F.2d 844 (D.C. Cir. 1987) ..........................................45

*Greater Boston Television Corp.* v. *FCC*,
    444 F.2d 841 (D.C. Cir. 1970) ........................................45

\* *Horsehead Res. Dev. Co.* v. *Browner*,
    16 F.3d 1246 (D.C. Cir. 1994) ..................................... 29, 33, 37, 38

*Ingalls Shipbuilding, Inc.* v. *Dir.*, *Office of Workers' Comp. Programs*,
    519 U.S. 248 (1997).........................................................26

*Int'l Fabricare Inst.* v. *EPA*,
    972 F.2d 384 (D.C. Cir. 1992) .......................................37

*Int'l Union, United Mine Workers of Am.* v. *Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005) .....................................30

\* *Mack Trucks, Inc.* v. *EPA*,
    682 F.3d 87 (D.C. Cir. 2012) ............................ 2-3, 10-13, 15-17, 23-24, 40-41

*MCI Telecomms. Corp.* v. *FCC*,
    57 F.3d 1136 (D.C. Cir. 1995) .......................................30

*N.E. Md. Waste Disposal Auth.* v. *EPA*,
    358 F.3d 936 (D.C. Cir. 2004) .......................................30

*Nat'l Petrochemical & Refiners Ass'n* v. *EPA*,
    287 F.3d 1130 (D.C. Cir. 2002) .......................... 6, 10, 12

*Natural Res. Def. Council* v. *EPA*,
    571 F.3d 1245 (D.C. Cir. 2009) ...................................25

*Natural Res. Def. Council* v. *EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) .......................................3

*Omnipoint Corp.* v. *FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ........................................36

*Owner-Operator Indep. Drivers Assoc.* v. *Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 1997) ........................................................29

*OXY USA, Inc.* v. *FERC*,
64 F.3d 679 (D.C. Cir. 1995) .........................................................45

*Prof'l Reactor Operator Soc'y* v. *U.S. Nuclear Reg. Comm'n*,
939 F.2d 1047 (D.C. Cir. 1991) .....................................................25

\* *Ramaprakash* v. *FAA*,
346 F.3d 1121 (D.C. Cir. 2003) ...............................................23, 39

\* *Shell Oil Co.* v. *EPA*,
950 F.2d 741 (D.C. Cir. 1991) ..................................................31, 32

*Sherley* v. *Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .......................................................26

*Small Refiner Lead Phase-Down Task Force* v. *EPA*,
705 F.2d 506 (D.C. Cir. 1983) .......................................................32

*United States* v. *Wilson*,
503 U.S. 329 (1992).......................................................................26

*Weyerhaeuser Co.* v. *Costle*,
590 F.2d 1011 (D.C. Cir. 1978) ...............................................35, 36

*Williams Gas Processing-Gulf Coast Co.* v. *FERC*,
475 F.3d 319 (D.C. Cir. 2006) .......................................................40

**STATUTES:**

5 U.S.C. § 553(b)(3) ...................................................................28, 29

5 U.S.C. § 706(2)(A) ..................................................................24, 25

42 U.S.C. § 7422(a) ..........................................................................6

**TABLE OF AUTHORITIES—Continued**

Page

42 U.S.C. § 7521(a)(1) ..............................................................6

42 U.S.C. § 7525(a) ..................................................................6

42 U.S.C. § 7525(g)(1) .............................................................6

42 U.S.C. § 7525(g)(2) .............................................................7

42 U.S.C. § 7525(g)(3)(E) ..............................................7, 23, 43

42 U.S.C. § 7607(b) ..................................................................1

42 U.S.C. § 7607(d)(9)(A) ...............................................24, 25

RULES AND REGULATIONS:

\* 40 C.F.R. § 86.1103-87(a)(1) (2012) ...................18, 19, 20, 25

\* 40 C.F.R. § 86.1103-87(b) (2012) ....................................8, 37

40 C.F.R. § 86.1104-91(a) (2012) ..........................................46

40 C.F.R. § 86.1113-87 ............................................................9

40 C.F.R. § 86.1113-87(a)(4) ...............................................9, 46

\* 50 Fed. Reg. 9204 (Mar. 6, 1985) ................7, 8, 22, 27, 38, 39

\* 50 Fed. Reg. 35,374 (Aug. 30, 1985) ..........................7, 8, 9, 43

61 Fed. Reg. 6944 (Feb. 23, 1996) ........................................38,

66 Fed. Reg. 5002 (Jan. 18, 2001) ..........................................10

67 Fed. Reg. 2159 (Jan. 6, 2002) ............................................41

67 Fed. Reg. 51,464 (Aug. 8, 2002) .....................................8, 41

Page

**OTHER AUTHORITIES:**

EPA, *Regulatory Announcement: Non-Conformance Penalties for
Heavy-Duty Diesel Engines* (Aug. 2002) ........................................................14

# GLOSSARY

APA:        Administrative Procedure Act

EGR:        Exhaust Gas Recirculation

EPA:        Environmental Protection Agency

g/bhp-hr:   Grams per Brake Horsepower-Hour

NCP:        Nonconformance Penalty

$NO_x$:     Nitrogen Oxides

SCR:        Selective Catalytic Reduction

---

No. 12-1433

---

DAIMLER TRUCKS NORTH AMERICA LLC, *et al.*,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent,

NAVISTAR, INC.,

Intervenor.

---

On Petition for Review from the United States
Environmental Protection Agency

---

**INITIAL OPENING BRIEF FOR PETITIONERS**

---

**JURISDICTIONAL STATEMENT**

This Court has jurisdiction to review the challenged agency action under

section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b). The Environmental

Protection Agency (EPA) published its Final Rule in the Federal Register on

September 5, 2012. Petitioners timely filed their petition for review within 60 days

of that publication.

**INTRODUCTION**

A few months ago, this Court vacated an EPA Interim Final Rule whose "only purpose" was " 'to rescue [intervenor Navistar] from the folly of its own choices.' " *Mack Trucks, Inc.* v. *EPA*, 682 F.3d 87, 92 (D.C. Cir. 2012) (citation omitted). Navistar's folly was a series of business decisions that led it to squander the nine years of lead-time all manufacturers had to develop engines capable of meeting new, more stringent emission limits for nitrogen oxides ($NO_x$). Having spurned—and publicly ridiculed—the technology that every other company had successfully adopted to comply with that standard, Navistar alone "bet on finding a way to make [its alternative approach] a feasible and compliant technology before" time ran out. *Id.* at 89. After failing to do so, and as "Navistar's day of reckoning * * * fast approach[ed]," *id.*, it beseeched EPA to bail it out. Which the Agency did. As this Court explained, EPA "leapt into action"; bypassing "formal notice and comment, EPA hurriedly promulgated" an interim final rule to spare Navistar from its own miscalculations. *Id.* at 89-90.

This case is déjà vu all over again. Then, as now, EPA bailed out Navistar by authorizing it to pay a nonconformance penalty (NCP). As its name suggests, an NCP allows a manufacturer to pay a penalty for the right to produce engines that exceed an existing emission standard. But NCPs pose a colossal risk to fairness and competition: If not judiciously deployed, a noncompliant

manufacturer will enjoy a distinct advantage over competitors who played by the rules and invested millions to comply with the emissions standard. Aware of that, EPA's regulations and consistent past practice have authorized NCPs only for manufacturers who could prove that their inability to comply with an emission standard was the result of lagging technology, not poor business judgment.

Until now. Although this Court in *Mack Trucks* vacated EPA's hasty initial bid to bail out Navistar based on its many procedural flaws, it also went out of its way to urge EPA to carefully reconsider its justifications for the NCP before promulgating a final rule to replace the interim one. *See id.* at 95. "Based solely on what EPA ha[d] offered in the" interim final rule—a rule which was identical to the proposed version of the final rule at issue in this case—the Court warned it was "highly skeptical" that an identical final rule would be able to survive scrutiny on the merits. *Id.* at 95-96.

Instead of taking that admonition seriously, EPA rushed once again to bail out Navistar. It debuted a new NCP Final Rule a mere 79 days after this Court's decision in *Mack Trucks*, a startling display of efficiency for an agency that has been known to take up to *15 years* to respond to this Court's decisions. *See Natural Res. Def. Council* v. *EPA*, 489 F.3d 1250, 1265 (D.C. Cir. 2007) (Rogers, J., concurring in part and dissenting in part) (collecting examples). But that quick turn-around was made possible only by EPA taking a new set of procedural short

cuts and by doubling down on the flawed analysis this Court already questioned.

Among the most troubling aspects of the Final Rule is how it responded to public comments that the Agency was misapplying its own NCP regulations. Unable to come up with a satisfying justification for an NCP for Navistar under its existing criteria, EPA simply redefined the criteria—without notifying the public that it was contemplating such a radical revision to its regulations, let alone soliciting comment on the about-face. And when the Agency finally did attempt to justify an NCP for Navistar under its previous rule, it relied on evidence that post-dated the close of the comment period by more than two months. This Court has never countenanced such tactics by agencies before. It should not do so here.

But if that were not enough, EPA's determination to force through an NCP for Navistar resulted in the Agency completely ignoring what it had said and done in its past NCP rulemakings. Before, EPA told manufacturers that it would not authorize NCPs when all a manufacturer must do to comply is transfer an established technology to its vehicles or engines. But now, even though Navistar announced it would adopt a technology its own general counsel described as "off the shelf," EPA still found NCPs justified. Before, EPA ensured that the NCP penalty would be stiff enough to deprive the noncompliant manufacturer of a competitive advantage by calibrating the NCP to reflect all the costs compliant manufacturers incurred. But now, EPA has decided to limit the costs it builds into

the NCP to only a fraction of those incurred by compliant manufacturers. The Final Rule, like the Interim Final Rule, should be vacated.

## ISSUES PRESENTED FOR REVIEW

1. Whether EPA's Final Rule—which fundamentally redefined the Agency's standard for assessing "substantial work" under the agency's NCP regulations—is a logical outgrowth of EPA's proposed rule, which did not suggest that the Agency was contemplating a change to this regulatory provision.

2. Whether EPA gave sufficient notice of its intention to find that Navistar will need to engage in substantial work in the future to comply with the applicable emissions standards, given that the work EPA found substantial in the Final Rule— converting to Selective Catalytic Reduction (SCR) technology—was something Navistar itself had not agreed to do until after the comment period closed.

3. Whether Navistar is an economic—not technological—laggard in developing emissions controls for its engines because it chose to forgo a readily available emissions-control technology in order to pursue a different emissions-control strategy that it thought would give it a competitive advantage.

4. Whether the cost of the NCP set in the Final Rule is arbitrary or capricious because EPA relied on a methodology that—without any rational explanation—deviated from the Agency's longstanding practices and failed to ensure that compliant manufacturers were not put at a competitive disadvantage.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in the addendum to this brief.

## STATEMENT OF FACTS

**The Statutory Framework.** Section 202 of the Clean Air Act authorizes EPA to prescribe standards for the emission of air pollutants from new motor vehicles and engines that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). EPA is required to set emission standards that "reflect the greatest degree of emission reduction achievable" through cost-effective technology. *Id.* § 7521(a)(3); *Nat'l Petrochemical & Refiners Ass'n* v. *EPA*, 287 F.3d 1130, 1134 (D.C. Cir. 2002).

The Clean Air Act further requires that manufacturers of new motor vehicles and engines annually secure "certificates of conformity" from EPA before introducing their vehicles and engines into commerce. *See* 42 U.S.C. §§ 7422(a), 7525(a). As their name suggests, EPA will only issue certificates of conformity if the vehicles and engines at issue have been tested and conform to EPA emission standards. *Id.* § 7525(a)(1).

Congress allowed just one exception to this general rule: Under certain circumstances, a manufacturer could pay "nonconformance penalties" in lieu of complying with an emission standard. *Id.* § 7525(g)(1). But Congress was also

concerned about the fairness of letting a noncompliant manufacturer get by with a penalty while its competitors complied with the law. So it mandated that the amount of the NCP "shall remove any competitive disadvantage to manufacturers whose engines or vehicles achieve the required degree of emission reduction." *Id.* § 7525(g)(3)(E).

To achieve that goal, Congress mandated that NCP regulations contain two key features. First, the regulations must establish the "degree" to which any particular nonconforming engine may exceed applicable emission standards and still qualify for NCPs. 42 U.S.C. § 7525(g)(2). In other words, the regulations must set an "upper limit" for emissions from any engines covered by NCPs. Second, and more importantly, EPA must fix the cost of NCPs according to a formula that will not work a competitive disadvantage to compliant manufacturers. *Id.* § 7525(g)(3).

**EPA's NCP Regulations.** EPA issued "generic" NCP regulations in 1985 that laid out the framework the Agency would use to determine whether NCPs should be promulgated, and, if so, how much the NCP should be. 50 Fed. Reg. 35,374 (Aug. 30, 1985). And in crafting those regulations, EPA hewed carefully to Congress's guidance.

*The Availability Criteria.* In its generic rule, EPA recognized that "NCPs need not necessarily be made available every time EPA promulgates or revises an

7

emission standard[.]" 50 Fed. Reg. 9204, 9205 (Mar. 6, 1985). Thus, at the outset, EPA established three key conditions—known as the "availability criteria"—that must exist before the Agency will issue NCPs: (1) the emission standard for which NCPs are authorized must be new and more stringent than the previous standard; (2) "substantial work will be required" to meet the more stringent standard; and (3) there is "likely" to be a "technological laggard." 50 Fed. Reg. at 35,374-76 (codified at 40 C.F.R. § 86.1103-87). And EPA was clear that these availability criteria were more than aspirational: "This generic rule imposes three conditions * * * that *must be met* before NCPs will be made available[.]" *Id.* at 35,375 (emphasis added).

EPA also explained that the phrase "substantial work" is a term of art. In the NCP context, "substantial work" means more than just effort that is significant; it instead captures a more precise and fundamental concept: "the application of technology not previously used in an engine or vehicle class or subclass, or the significant modification of existing technology needed to bring the vehicle or engine into compliance." 40 C.F.R. § 86.1103-87(b) (2012). Similarly, a "technological laggard" is "a manufacturer who cannot meet a particular emission standard due to technological (not economic) difficulties." 67 Fed. Reg. 51,464, 51,465 (Aug. 8, 2002). Although "substantial work" and "technological laggard" are related concepts, they operate independently. As EPA explained, "[a]n

8

emission standard may become more difficult to meet and substantial work may be required for compliance, but if that work merely involves transfer of well-developed technology from another vehicle class, it is unlikely that a technological laggard would develop." *Id.*

*The NCP Formula.* EPA's generic rule also established a formula for the Agency to calculate an NCP amount once it had determined that the three availability criteria were satisfied. 40 C.F.R. § 86.1113-87 (2012). Consistent with the Clean Air Act's goal of removing any competitive disadvantage to compliant manufacturers, EPA's formula pegs the NCP to the costs incurred by conforming manufacturers whose compliance costs are in the 90th percentile. *Id.* § 86.1113-87(a)(4). Calibrating the NCP this way ensures that the noncompliant manufacturer will pay an NCP that reflects the costs of compliance borne by virtually every compliant manufacturer. *See* 50 Fed. Reg. at 35,382.

EPA further explained that the cost-of-compliance variable must include "the incremental production costs involved in bringing an engine or vehicle into conformity with a standard." *Id.* So too must the calculus capture "engineering and development costs." *Id.* And EPA emphasized that the Agency must account for the fact that the cost of compliance "may be associated with the addition of a significant emissions control hardware item." *Id.* at 35,381.

**The 2001 NO$_x$ Rule.**  In 2001, EPA announced an ambitious goal for on-highway heavy heavy-duty diesel engines:  The industry would reduce the NO$_x$ output from its engines to 0.20 grams per brake horsepower-hour (g/bhp-hr) by 2010, a 95 percent drop from the standard then in effect.  66 Fed. Reg. 5002 (Jan. 18, 2001).  EPA understood that this dramatic reduction could not occur overnight. The Agency recognized that its new standard would be "technology-forcing"; manufacturers would have to innovate if they were to comply and remain in the market.  *See id.* at 5010; *Nat'l Petrochemical*, 287 F.3d at 1136.  Thus, EPA gave manufacturers nine years to innovate and produce fully compliant engines.  66 Fed. Reg. at 5005.

**The Industry's Response To The 2010 NO$_x$ Standard.**  During the nine-year phase-in period, the heavy heavy-duty diesel engine industry rose to the challenge posed by the 0.20 g/bhp-hr NO$_x$ standard.  Exploring all available alternatives, Petitioners and other heavy heavy-duty diesel engine manufacturers each settled on and worked diligently to develop SCR technology[1] to reach the 0.20 g/bhp-hr standard.  *Mack Trucks*, 682 F.3d at 89.  As EPA itself noted, "the

---

[1] SCR is an after-treatment technology that removes NO$_x$ from a truck's exhaust stream.  J.A. __ [Final TSD 18].  It uses a catalytic converter and a liquid-urea reducing agent, called diesel exhaust fluid, to convert the NO$_x$ into nitrogen and water and can by itself reduce a truck's NO$_x$ emissions by up to 90 percent.  J.A. __ [Final TSD 18-19].

approach with an SCR system appears to be a sound and cost effective pathway to achieve 2010 emissions standards while improving fuel economy and it is the primary path being used around the world." J.A. __ [Final TSD 25].

Petitioners' success did not come cheap. As this Court has recognized, Petitioners spent "hundreds of millions of dollars" to develop and adapt SCR for the U.S. market. *Mack Trucks*, 682 F.3d at 89. But as is often the case with technological innovation, this pioneering work redounded to the benefit of other manufacturers. As of 2012, when the Final Rule at issue in this case was promulgated, SCR had evolved to "off the shelf" technology that can be used by any manufacturer. J.A. __ [NCP Hearing Tr. 44] (statement of Navistar's general counsel).

There was one exception to the industry's collective approach to compliance: Navistar. From the start, Navistar theorized that heavy heavy-duty diesel truck customers would resist putting diesel exhaust fluid into their trucks. Thus, it believed that its "Advanced EGR [Exhaust Gas Recirculation]" technology—which did not require the diesel exhaust fluid used by SCR—would give it a competitive advantage. Navistar touted as recently as its 2011 annual report: "We have chosen EGR, combined with other technologies, as our solution to meet the 2010 emissions standards. * * * We believe that our customer-friendly solution provides our products with a significant competitive advantage in

11

North America, because most truck and engine manufacturers have chosen liquid-based urea SCR as the solution to meet 2010 emission standards." J.A. __ [Volvo cmt. Exhibit 3].

Navistar did not lack the technological know-how to use SCR technology. It just chose not to. As one Navistar official explained, "There's no question that SCR works. It's just not the choice our management wanted to take. It's just too easy." J.A. __ [Cummins cmt. 3-4]. Indeed, Navistar uses SCR in some of its own engines marketed overseas. *Id.*; J.A. __ [DTNA cmt. 6].

Instead of developing SCR for its U.S. engines, Navistar initially focused on generating emission "credits" that could be used to compensate for nonconforming engines in later years.[2] J.A. __ [DTNA cmt. 7]. According to Navistar's marketing materials, the company made a "strategic business decision" to accumulate and use these credits as a way to keep producing nonconforming engines past the 2010 $NO_x$ deadline. *See id.* Navistar's plan for compliance post-2010 was thus a gamble: "[I]t bet on finding a way to make exhaust gas recirculation a feasible and compliant technology before its finite supply of credits ran out." *Mack Trucks*, 682 F.3d at 89.

---

[2] EPA's regulations allow manufacturers to accrue "credits" when an engine's emissions are below the applicable limit and "bank" them to spend on engines whose emissions are above the applicable limit in later years. *See Nat'l Petrochemical*, 287 F.3d at 1148.

**The Interim Final Rule And Proposed Final Rule.** That bet did not pay off. As this Court put it, by late 2011, "Navistar's day of reckoning [was] fast approaching: its supply of credits [was] dwindling and its engines remain[ed] noncompliant." *See id.* But rather than admit defeat and transition to a new, conforming technology, as its competitor Cummins had, J.A. __ [Cummins cmt. 7], Navistar asked EPA to bend the rules. In October 2011, Navistar told EPA that it would run out of credits sometime in 2012. J.A. __ [77 FR 4738]. EPA concurred; it calculated that Navistar " 'might have as little as three to four months' " of available credits before it ran out and would have to stop introducing its nonconforming engines into commerce. *Mack Trucks*, 682 F.3d at 89.

Based on that conclusion, EPA, with uncharacteristic alacrity, "leapt into action." *Id.* Without giving the public formal notice of its intentions and without providing an opportunity for comment, EPA—in this Court's words—"hurriedly" published an NCP Interim Final Rule on January 31, 2012. *Id.* Under that rule, Navistar was allowed to produce engines that emit up to 0.50 g/bhp-hr of $NO_x$—two-and-a-half times the 2010 $NO_x$ standard. 77 Fed. Reg. at 4682. It simply had to pay a penalty of no more than $1,919 per engine, *id.* at 4683, a pittance compared to the $12,210 penalty that EPA established in 2002 for an equivalent two-and-a-half-times deviation from the prior standard. *See* 67 Fed. Reg. at

51,478; *see also* EPA, *Regulatory Announcement: Non-Conformance Penalties for Heavy-Duty Diesel Engines* (Aug. 2002) at 3.[3]

Along with the Interim Final Rule, EPA published a notice of proposed rulemaking for a Final Rule that, in all material respects for this appeal, was a cut-and-paste clone of the Interim Final Rule. *See* J.A. __ [77 FR 4738] (proposed rule accidently referring to "This Interim Final Rule"). Like the rushed Interim Final Rule, EPA found in the proposed Final Rule that Navistar will have to conduct substantial work to make its engines compliant. *Id.* EPA explained that because other manufacturers had adapted SCR for their vehicles in the past, it was "logical to conclude that * * * substantial work *was* required to meet the [0.20 g/bhp-hr] emission standard." *Id.* (emphasis added). Also like the Interim Final Rule, EPA found in the proposed Final Rule that Navistar was a technological laggard because Navistar "ha[d] not yet submitted an application" for a compliant engine. J.A. __ [*Id.* at 4738-39].

In addition to finding that NCPs for Navistar were appropriate, EPA proposed a new method for calculating the NCP amount. J.A. __ [*Id.* 4740] (method for calculating NCP in proposed rule "differs * * * from that used in previous NCP rules"). Although the symbols in the NCP formula remained the

---

[3] *Available at* http://epa.gov/oms/regs/hd-hwy/ncp/f02025.pdf.

same, EPA's new method eschewed its previous practice of measuring compliant manufacturers' total costs of compliance. In its place, EPA proposed counting only the costs that compliant manufacturers incurred to reduce their emissions from 0.50 g/bhp-hr, the upper limit proposed for the Final Rule, to 0.20 g/bhp-hr, the current $NO_x$ emission standard. *Id.*

   ***Mack Trucks.*** Petitioners petitioned for review of the Interim Final Rule in this Court on both procedural and substantive grounds. *Mack Trucks*, 682 F.3d at 90-91. They also submitted comments to EPA substantiating their claims that NCPs were inappropriate for Navistar under EPA's existing regulations and that the proposed NCP was methodologically and factually flawed. J.A. __ [DTNA and Volvo Comments].

   In June 2012, a unanimous panel of the Court, in an opinion by Judge Brown, held that EPA did not have good cause to bypass notice and comment in promulgating the Interim Final Rule. *Mack Trucks*, 682 F.3d at 89, 95. As the Court explained, EPA's claim that good cause could justify bypassing notice and comment for an interim final rule whose "only purpose" was " 'to rescue a lone manufacturer from the folly of its own choices' " was "nonsensical." *Id.* at 93-94 (citation omitted).

But although the Court vacated the Interim Final Rule on procedural grounds, it took the opportunity to "offer two observations" on the substance of the proposed Final Rule "[b]efore the ink [was] dry." *Id.* at 95.

First, the Court warned EPA that "NCPs are meant to be a temporary bridge to compliance for manufacturers that have 'made every effort to comply,' " not "bail out manufacturers that voluntarily choose, for whatever reason, not to adopt an existing, compliant technology." *Id.* (citation omitted). Thus, the Court warned that "[b]ased solely on what EPA has offered in the [Interim Final Rule], it * * * appears to us that NCPs are likely inappropriate in this case." *Id.*

Second, the Court "emphasize[d] that 'no legislation pursues its purposes at all costs' " and that although "the Clean Air Act requires EPA to issue NCPs when it determines the necessary criteria are satisfied, it also expressly demands that EPA 'remove any competitive disadvantage' " to compliant manufacturers. *Id.* at 95-96 (citations omitted). The Court therefore observed that "as it is presented in the [Interim Final Rule], we are highly skeptical that the penalty and upper limit provided for in this NCP satisf[ies] this congressional demand to protect compliant manufacturers." *Id.* at 96.

Of course, the Court recognized that "EPA is certainly free to make whatever findings it deems appropriate in the pending final rulemaking." *Id.* But

it cautioned EPA that any findings it makes are "subject * * * to this Court's review." *Id.*

**The Final Rule.** Just days after *Mack Trucks* came down, Navistar threw in the towel. In a much-publicized announcement to investors and industry analysts, Navistar declared an end to its Quixotic bid to certify an EGR-only engine. Instead, after years of disparaging SCR, Navistar relented and announced unequivocally that it would henceforth rely on that proven technology to achieve 0.20 g/bhp-hr $NO_x$ compliance—just like all of its competitors. J.A. __ [DTNA July cmt. 1].

Navistar further assuaged potential investor and customer concerns about the costs and timing of adopting SCR by publicly emphasizing just how effortless the switch would be. Navistar executives bragged that the company's use of SCR in Brazil gave "the company a head start on integrating the system into its North American engine lineup," and promised that Navistar would "seamlessly offer[] production-ready vehicles" in the near future. J.A. __ [*Id.* at 2].

Given that Navistar renounced EGR-only technology, adopted what it itself referred to as SCR's "off the shelf" technology, and proclaimed that it would require no great effort to implement that switch, the Agency's NCP analysis required a fundamental shift. After all, these late-breaking developments cast even more doubt on whether Navistar faced any "substantial work" in adopting this off-

17

the-shelf technology, and whether Navistar remained—if it ever truly was—a "technological laggard."

Rather than seeking comments regarding how these fundamental changes might affect the Final Rule, EPA rushed ahead, with the Administrator signing the Final Rule on August 30, 2012—a mere 79 days after *Mack Trucks* came down. J.A. __ [77 FR 54,401]. And in doing so, EPA continued to rely on the flawed analysis it hurriedly put together for the proposed rule. For instance, although EPA increased the NCP by $1,856 based on information it received from compliant manufacturers, J.A. __ [77 FR 54,396], it refused to revisit its new methodology for calculating the NCP amount. J.A. __ [77 FR 54,397-98]. And although EPA acknowledged Navistar had announced it was transitioning to off-the-shelf SCR technology and could have adopted that technology earlier, it reflexively reaffirmed its earlier finding that Navistar was a technological, not economic, laggard. J.A. __ [77 FR 54,390-91].

But the Final Rule differed from the proposed rule in one major respect. In the proposed rule, EPA deemed an NCP appropriate because substantial work *was required* to meet the 0.20 g/bhp-hr standard. Commenters pointed out that EPA had asked and answered the wrong question. J.A. __ [Cummins cmt. 3; Volvo cmt. 7, 9; DTNA cmt. 5]. The regulation's plain language authorizes NCPs only when the Agency finds that substantial work "*will be* required" to meet the

standard. 40 C.F.R. § 86.1103-87(a)(1) (2012) (emphasis added). By focusing on whether substantial work *was* required at some point in the distant past, EPA fundamentally recalibrated the temporal trigger for satisfying the "substantial work" prong. J.A. __ [Cummins cmt. 3]. And commenters explained that EPA's proposed finding conflicted with more than just the plain language of the Agency's own regulations; it also conflicted with EPA's consistent past practice and the very essence of NCPs. After all, to let a manufacturer produce noncompliant engines while its competitors are already playing by the rules would only make sense if substantial work still "will be" required. The fact that substantial work *was* at one point needed to satisfy a new emissions limit is irrelevant when virtually the entire industry has already completed that substantial work.

In the Final Rule, EPA acknowledged that many commenters objected to the Agency finding the substantial-work prong satisfied by applying a formulation that conflicts with the regulation's plain language. J.A. __ [Comment Response 8]. But rather than try to harmonize its finding with the language of the regulation, EPA simply moved the goal posts. It announced that it was amending the language of the regulation. J.A. __ [77 FR 54393] (change to regulation was "in response to comments").

Under EPA's new regulation, the Agency must now find that "substantial work *is* required" and "[s]ubstantial work is determined by the total amount of

work required to meet the standard for which the NCP is offered, compared to the previous standard, irrespective of when EPA establishes the NCP." J.A. __ [77 FR 54,401] (emphasis added). And in applying this new formulation of "substantial work," EPA found that Navistar met it. EPA therefore authorized NCPs for Navistar's Model Year 2012 engines and forward, and set the NCP at $3,775— over $4,000 less than the lowest cost of compliance submitted by compliant commenting manufacturers. J.A. __ [77 FR 54,402; Cummins cmt. 17].

This petition followed.

## SUMMARY OF ARGUMENT

I. The Final Rule should be vacated because EPA improperly "pull[ed] a surprise switcheroo on regulated entities." *Envtl. Integrity Project* v. *EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). In the proposed rule, EPA justified its substantial-work finding by suggesting that substantial work *was* required in the past. But as comments from Navistar's competitors pointed out, that was not the test set forth in EPA's regulations. That test had always asked—and the Agency had always examined—whether substantial work "will be required." 40 C.F.R. § 86.1103-87(a)(1) (2012).

The Final Rule addressed these objections not by engaging with Petitioners, but by simply changing the rules of the game. The Agency thus amended its substantial-work definition in the Final Rule to track the Navistar-specific findings

of fact that it had made in the proposed rule. But that turns the APA on its head. Agencies may not reverse-engineer legal rules based on the idiosyncratic facts of one particular regulated entity. If EPA wants to revise its substantial-work definition, it must play by the usual administrative rules: provide the public with notice that it *intends* to revise its regulations and invite comments on that specific proposal. Because EPA short-circuited that critical step here, the Final Rule should be vacated.

The Final Rule's alternative finding that Navistar will need to engage in substantial work in the future under EPA's unamended regulation suffers from the same flaw. The Final Rule based this alternative finding on the work Navistar must do to integrate SCR into its engine and vehicle designs, J.A. __ [77 FR 54,390], but the proposed rule never even hinted that EPA would rely on Navistar's switch to SCR for its substantial-work findings. For good reason: Navistar did not announce it would change to SCR until after the comment period on the Final Rule closed. Before EPA could rely on Navistar's newfound embrace of SCR to satisfy the substantial-work prong, the Agency would have had to invite comments from the public on that critical question. By failing to do so—and by rejecting as untimely comments that Petitioners had offered without solicitation—EPA once again flouted orderly rulemaking. *See Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1059 (D.C. Cir. 2000).

II. The Final Rule is also substantively flawed. EPA could authorize NCPs here only if it properly found that Navistar was a technological—not economic—laggard in developing emissions-control technologies. 67 Fed. Reg. at 51,465. The line separating technological and economic laggards is clear-cut. As EPA has explained, if "compliance with a standard * * * involve[s] merely the transference of technology from a similar application," 50 Fed. Reg. at 9206, a technological laggard does not exist. Here, all Navistar must do to make its engines and vehicles compliant is transfer SCR, a technology its own general counsel has described as "off the shelf," J.A. __ [NCP Hearing Tr. 44], from its use in other heavy heavy-duty diesel engines and vehicles. Navistar therefore cannot be a technological laggard. EPA, however, never reconciled its finding that Navistar is a technological laggard with this straight-forward syllogism drawn from the Agency's own past pronouncements.

But even if Navistar's use of SCR were not a mere transference from other applications, EPA was still wrong to find Navistar a technological laggard. Although the Final Rule goes on at length about how Navistar cannot complete its transition to SCR before it runs out of emissions credits, EPA never acknowledges Navistar's business decisions that led to that inability. Navistar had the engineering know-how to make the switch to SCR while it still had sufficient credits remaining. Instead, it made an economic decision to wait until its credits

reached crisis levels and then turned to EPA to bail it out with NCPs. That decision may have been a bad one for Navistar, but as this Court has said, "NCPs are not designed to bail out manufacturers," like Navistar, "that voluntarily choose * * * not to adopt an existing, compliant technology." *Mack Trucks*, 682 F.2d at 95.

III. Finally, even if EPA properly made NCPs available for Navistar, the Final Rule should still be vacated because it set the NCP amount far too low to achieve the NCP statute's paramount goal of "remov[ing] any competitive disadvantage to [compliant] manufacturers." 42 U.S.C. § 7525(g)(3)(E). EPA calculated the NCP here by relying on a novel methodology that deviated from its longstanding practice of considering compliant manufacturers' total costs of compliance, including significant fixed costs and research and development. The Agency then compounded that mistake by failing to offer a reasonable explanation for its switch. Because "[a]gency action is arbitrary and capricious if it departs from agency precedent without explanation," the Final Rule should be vacated for this reason, too. *Ramaprakash* v. *FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (Roberts, J.).

## STANDING

In *Mack Trucks*, this Court held that Petitioners "clearly ha[d] standing as direct competitors of Navistar" to challenge the almost-identical Interim Final Rule

23

at issue in that case.  682 F.3d at 91.  Nothing has changed between then and now to alter that conclusion.  Now, as then, EPA's NCP Final Rule " 'authorizes allegedly illegal transactions that have the clear and immediate potential to compete with [Petitioners'] own sales.' "  *Id.* (quoting *Sherley* v. *Sebelius*, 610 F.3d 69, 72-73 (D.C. Cir. 2010)); *see also* David Kayes Declaration (A32-33); Anthony Greszler Declaration (A35-37).  Now, as then, Navistar is using the NCPs authorized by the Final Rule to sell competitive engines, so Petitioners' injury is "anything but conjectural."  *Mack Trucks*, 682 F.3d at 91; *see also* Navistar Motion to Intervene at 3.  And now, as then, Petitioners' injury is " 'clear[ly]' " traceable to EPA's Final Rule, which authorizes the allegedly illegal competition Petitioners are injured by.  *Mack Trucks*, 682 F.3d at 91.  Finally, "because 'NCP provisions mandate that penalties * * * remove any competitive disadvantage to manufacturers whose engines or vehicles achieve the required degree of emissions reduction,' Petitioners' 'interest in avoiding anticompetitive injury plainly falls within the zone of interests Congress sought to protect.' "  *Id.*  (citations omitted). Thus here, as in *Mack Trucks*, Petitioners have standing to challenge the Final Rule.

## STANDARD OF REVIEW

This Court will set aside EPA's action under both the Administrative Procedure Act and the Clean Air Act if it is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); 42 U.S.C. § 7607(d)(9)(A). And although this Court gives some deference to EPA's interpretation of the Clean Air Act in some circumstances, *see Natural Res. Def. Council* v. *EPA*, 571 F.3d 1245, 1251 (D.C. Cir. 2009), it owes no deference to EPA in implementing the APA's notice-and-comment requirements. *See Prof'l Reactor Operator Soc'y* v. *U.S. Nuclear Reg. Comm'n*, 939 F.2d 1047, 1051 (D.C. Cir. 1991) ("[R]eviewing courts do not owe * * * deference to an agency's interpretation of statutes that, like the APA, are outside the agency's particular expertise and special charge to administer.").

## ARGUMENT

**I. EPA IMPROPERLY AMENDED THE SUBSTANTIAL-WORK REGULATIONS AND MADE OTHER KEY FINDINGS WITHOUT PROVIDING THE PUBLIC WITH ADEQUATE NOTICE AND OPPORTUNITY TO COMMENT.**

The Final Rule should be vacated because EPA did not give the public adequate notice that it would amend its substantial-work regulation in the Final Rule or that it would find that Navistar will need to engage in substantial work in the future to make its engines and vehicles compliant based on its switch to SCR. Since 1985, when EPA promulgated its generic rule, the Agency had always measured substantial work the same way: That criterion would be satisfied only if "EPA finds [t]hat * * * substantial work *will be required* to meet the standard for which the NCP is offered." 40 C.F.R. § 86.1103-87(a)(1) (2012) (emphasis

added).  EPA's choice of the future tense in the regulation—"will be required"—was legally and factually important.

It was legally important because, as the Supreme Court has consistently recognized in the analogous task of interpreting statutes, "Congress's use of a verb tense is significant."  *United States* v. *Wilson*, 503 U.S. 329, 333 (1992); *see also Carr* v. *United States*, 130 S. Ct. 2229, 2236-37 (2010) (collecting cases).  Indeed, courts most often examine verb tense in cases like this, where the court must decide when an action must occur to satisfy a particular statutory or regulatory criterion.  *See Ingalls Shipbuilding, Inc.* v. *Dir.*, *Office of Workers' Comp. Programs*, 519 U.S. 248, 255 (1997) ("[T]he use of the present tense (*i.e.*, 'enters'), indicates that the 'person entitled to compensation' must be so entitled at the time of settlement."); *see also Carr*, 130 S. Ct. at 2236 (statute's use of "travels" rather than "traveled" or "has traveled" indicated that travel required to trigger statute's application had to occur after the statute's enactment).  In sum, "[c]onsistent with normal usage, [courts] * * * frequently look[] to Congress's choice of verb tense to ascertain a statute's temporal reach."  *Carr*, 130 S. Ct. at 2236.

And one of the most important restrictions on a law's temporal reach is that "[t]he use of present tense in a statute strongly suggests that it does not extend to past actions."  *Sherley* v. *Sebelius*, 644 F.3d 338, 394 (D.C. Cir. 2011).  Of course,

if the present tense "strongly suggests" that a regulation does not extend to past actions, then the *future* tense practically screams it.

The future tense that EPA crafted for the substantial-work test was factually important, too. EPA explained in the generic rule that the point of the substantial-work requirement was to ensure that NCPs would be issued only when actual innovation would be needed to meet the new emission standard, rather than mere adaptation of existing technology. *See* 50 Fed. Reg. at 9205. Thus, EPA's use of the future tense in the substantial-work regulation confirms that the requirement is forward-looking—it only considers whether innovation is required *now* to succeed, not whether innovation was required at some indeterminate point in the past.

EPA never denied the importance of verb tense when it issued the Final Rule. J.A. __ [Comment Response 8, 11-12] (citing, but not distinguishing, the verb-tense cases discussed above). Instead, it moved the goalposts. In the Final Rule, EPA amended the tense in the substantial-work regulation from future to present. But because even the present tense wouldn't help Navistar, the Agency explained that its new present-tense formulation actually encompassed the past as well. With those contortions, EPA then proclaimed that the substantial-work prong was satisfied because Navistar faced substantial work more than a decade ago when the new emissions standard was first announced.

But EPA's revisions did not stop with tense-shifting edits. The Agency also

significantly revised the language of the substantial-work criterion. Whereas this provision previously stated that "[s]ubstantial work * * * means application of technology not previously used in an engine or vehicle class or subclass," EPA amended the regulation in the Final Rule to provide that substantial work is "the application of technology that was not generally used in an engine or vehicle class or subclass to meet standards *prior to the implementation of the new or revised standard*." J.A. __ [77 FR 54,401] (emphasis added). And to complete its about-face from longstanding practice, EPA confirmed that it would now determine substantial work "by the total amount of work required to meet the standard for which the NCP is offered, compared to the previous standard, *irrespective of when EPA establishes the NCP*." *Id.* (emphasis added).

Perhaps anticipating the vulnerabilities with its new language, EPA found in the alternative that Navistar would need to conduct substantial work in the future to comply with the 0.20 g/bhp-hr emission requirement based on its decision to switch to SCR technology. J.A. __ [77 FR 54,390]. Neither attempt to salvage EPA's foreordained decision to promulgate NCPs for Navistar was procedurally proper.

A. **EPA Cannot Justify Its Amended Substantial-Work Standard As A Logical Outgrowth Of The Proposed Rule.**

The Administrative Procedure Act demands that when EPA engages in rulemaking, it publish in the Federal Register a notice that includes "either the

terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The APA thus requires EPA's published proposed rule to " 'describe the range of alternatives being considered with reasonable specificity.' " *Horsehead Res. Dev. Co.* v. *Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994) (citation omitted). That mandate is more than an empty formalism. If EPA does not sufficiently detail the proposals it is considering, then " 'interested parties will not know what to comment on.' " *Owner-Operator Indep. Drivers Assoc.* v. *Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 209 (D.C. Cir. 1997) (citation omitted). And that, in turn, will mean that a critically important goal of notice-and-comment rulemaking cannot be achieved—" 'ensur[ing] that agency regulations are tested via exposure to diverse public comment.' " *Envtl. Integrity Project*, 425 F.3d at 996 (citation omitted).

Here, EPA gave no indication in the proposed NCP rule that it was considering changing the tense, and thus application, of the substantial-work regulation. Thus, barring some exception to the general rule that an agency must provide notice and comment before substantively revising regulations, the inquiry would end right there: EPA revised the substantial-work requirement without offering the public an opportunity to weigh in on that seismic shift.

The only exception that EPA may presumably invoke is the logical-outgrowth rule. That pragmatic concession recognizes that an agency need not

solicit a new round of comments every time it adopts a final rule that modifies its proposed findings. *N.E. Md. Waste Disposal Auth.* v. *EPA*, 358 F.3d 936, 951-952 (D.C. Cir. 2004). But "[t]he 'logical outgrowth' doctrine does not extend to a final rule that is a brand new rule, since 'something is not a logical outgrowth of nothing.' " *Int'l Union, United Mine Workers of Am.* v. *Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (citation omitted). Thus, in numerous cases, this Court has vacated final rules whose proposals "gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had completely changed its position." *CSX Transp., Inc.* v. *Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009) (collecting cases).

That is precisely what happened here. The proposed rule mentioned the substantial-work requirement only twice: once in a pro forma background section recounting the history of the NCP generic regulation, J.A. __ [77 FR 4738], and then again in EPA's two-sentence finding that Navistar's circumstances satisfied the substantial-work criterion because "substantial work was required to meet the [0.20 g/bhp-hr] standard." *Id.* Those scant references were hardly enough to give commenters notice that EPA was considering overhauling an important part of the substantial-work criterion. As this Court has said, "an agency may not turn the provision of notice into a bureaucratic game of hide and seek." *MCI Telecomms. Corp.* v. *FCC*, 57 F.3d 1136, 1142 (D.C. Cir. 1995). And this Court has

accordingly rejected agency arguments that notice of a proposed amendment is sufficient when a proposal is buried in a footnote or a background section that is unlikely to be read by commenting parties. *See id.* (collecting cases).

EPA in the Final Rule claimed that, by amending the substantial-work regulation, it was simply "clarifying" the regulation in response to "confusion" among commenters. J.A. __ [77 FR 54,390]. As EPA saw it, it had *always* interpreted the substantial-work criterion as focused on the work required when a new emission standard was enacted, not the work still required when EPA begins the NCP rulemaking process. J.A. __ [77 FR 54,389-90]. Apart from the fact that a clarification that completely revises a regulation cannot be a clarification, EPA's claim suffers from two additional fatal flaws. First, EPA did not so much as mention its supposedly long-standing interpretation in the proposed rule, and "[i]nterested parties cannot be expected to divine the EPA's unspoken thoughts." *Shell Oil Co.* v. *EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991). Second, even an "interpretation" such as EPA's must be preceded by adequate notice and an opportunity for comment. As this Court has explained, "[w]hen an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *See Alaska Prof'l Hunters Ass'n* v. *FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999). That EPA labeled its amendment an

"interpretation" of the substantial-work criterion does not take it outside the APA's requirement that the Agency give interested parties notice and an opportunity to comment on its proposed shift.

EPA also claimed that its amendment better achieved what the Agency saw as Congress's purpose in the NCP statute.  J.A. __ [77 FR 54,389-90; Comment Response 11].  But even if EPA's amendment were "the best regulatory approach the EPA could devise, it was not a logical outgrowth of the proposed regulations." *Shell Oil Co.*, 950 F.2d at 752.  The APA demands that agencies' rules not only achieve what the agency considers to be better policy, but also do it in a certain way:  by providing notice of the proposed policy to interested parties and allowing them an opportunity to comment on it.  *See generally Small Refiner Lead Phase-Down Task Force* v. *EPA*, 705 F.2d 506, 548-549 (D.C. Cir. 1983).  EPA is free to amend the definition of substantial work if it follows proper procedures in doing so, *see FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009), but what it cannot do is what it did here: "pull a surprise switcheroo on regulated entities" and adopt a final rule that bears no relation to the one proposed.  *Envtl. Integrity Project*, 425 F.3d at 996.

In the end, the question is whether commenters "would have known that an issue in which they were interested was 'on the table' and was to be addressed by [the] final rule."  *Am. Med. Ass'n* v. *United States*, 887 F.2d 760, 768 (7th Cir.

1989); *see also Horsehead Res. Dev. Co.*, 16 F.3d at 1268 ("Ultimately, the EPA simply failed to give interested parties sufficient notice of the form [the final rule] might take, undermining the aims of meaningful participation and informed decisionmaking."). Here, they did not. In all of their submissions, commenters assumed that the meaning of "substantial work" was settled, and addressed their arguments to whether Navistar's current circumstances fit that settled definition, not whether the definition itself should change. *See* J.A. __ [Cummins cmt. 2-3; Volvo cmt. 6-9; DTNA cmt. 5].

Because commenters did not know that EPA was contemplating a change to its substantial-work regulation, they were unable to provide comments that might have convinced EPA to not amend it. For instance, if they had the opportunity, Petitioners would have argued that judging the substantial-work requirement from the time that EPA promulgates its new emission standard—rather than when it begins the NCP rulemaking process—fails to acknowledge how technology evolves over time. Emissions-control technology that was once revolutionary— and that required "substantial work" to implement—at the time a new emissions standard is promulgated might become commonplace with the passage of time. In fact, that is precisely what happened with SCR. *See supra* at 11.

Moreover, Petitioners would have argued that shifting the focus of the substantial-work requirement to when the emission standard was promulgated

would make the substantial-work criterion redundant with the separate, new-standard requirement. *All* new EPA emission standards require some technological addition or modification to achieve. If the substantial-work criterion were measured from the time the new standard was promulgated, the requirement would always be met and therefore serve no readily discernible purpose. And regardless of whether EPA would have agreed with these arguments, it was required to at least hear them out. *See City of Waukesha* v. *EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (parties are prejudiced by final rule that is not logical outgrowth of proposed rule where, "had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale for the revised rule").

### B. EPA's Alternative Finding That Navistar Still Must Engage In Substantial Work Was Not A Logical Outgrowth Of The Proposed Rule.

Perhaps recognizing that its newly amended regulation might not survive judicial scrutiny, EPA found in the alternative that Navistar actually *will* need to engage in substantial work for its engines to achieve 0.20 g/bhp-hr $NO_x$ compliance. J.A. __ [77 FR 54,390]. But EPA's alternative finding suffers from the same notice problems as its principal finding.

In the proposed rule, EPA proposed finding that Navistar would need to engage in substantial work to perfect its EGR-only 0.20 g/bhp-hr engine design

because other manufacturers in the past had to engage in substantial work to make their SCR designs compliant.  J.A. __ [77 FR 4738].  But between the proposed and final rules, circumstances changed.  After *Mack Trucks*, Navistar abandoned its quest to perfect an EGR-only design, and adopted the same SCR design as its competitors.  J.A. __ [DTNA July cmt.1].  Thus, in the Final Rule, EPA's alternative substantial-work finding was based not on the work Navistar will have to do to perfect its EGR-only engine design, but on the work that Navistar will have to do to adapt its existing engine and vehicle designs to accept an SCR system.  J.A. __ [77 FR 54,390].

Commenters, however, had no opportunity to challenge EPA's basis for that markedly different finding.  The comment period for the Final Rule closed on April 4, 2012.  J.A. __ [77 FR 4746].  Navistar announced its switch to SCR on July 6.  J.A. __ [DTNA July cmt. 1].  And although an agency is not always required to solicit a new round of comments when it changes its findings based on information received during the comment period, it *is* required to do so when a new comment period would be commenters' " 'first occasion to offer new and different criticisms which the agency might find convincing.' "  *Ass'n of Battery Recyclers, Inc.*, 208 F.3d at 1059 (citation omitted); *see also Weyerhaeuser Co.* v. *Costle*, 590 F.2d 1011, 1031 (D.C. Cir. 1978) (new round of comment required when final rule was "a complex mix of controversial and uncommented upon data

and calculations" that were not part of the proposed rule).

That was the case here. Commenters had no inkling when they submitted their comments in April that Navistar—which, keep in mind, had spent the better part of a decade disparaging SCR to EPA, investors, and customers alike—would soon renounce EGR and embrace SCR. *See*, *e.g.*, J.A. __ [Navistar cmt. 3-6] (detailing Navistar's "commitment" to EGR-only engine design). And unable to predict that change of heart, commenters obviously had no reason to explain to EPA why Navistar would not face substantial work in implementing an SCR system.

The upshot is that, if EPA wanted to rely on post-commentary developments like these to satisfy the substantial-work standard, it needed to give the public notice of this fundamental shift. The change between the proposed and final rules' factual basis for finding that Navistar would need to engage in substantial work was " 'so major that the original notice did not frame the subjects for discussion.' " *Omnipoint Corp.* v. *FCC*, 78 F.3d 620, 631-632 (D.C. Cir. 1996) (citation omitted).

But it gets even worse for EPA. Even though the Agency never solicited comments on whether Navistar would face substantial work in implementing SCR, Petitioners all offered unbidden comments after July's announcement anyway. J.A. __ [DTNA July cmt.; Volvo June cmt.]. But EPA rejected them out of hand

as untimely.  For example, Daimler submitted supplemental comments addressing the issue less than two weeks after Navistar's announcement.  J.A. __ [DTNA July cmt.].  Yet instead of responding to the substance of Daimler's comment, EPA only "summarily review[ed]" it and dismissed it as "very late."  J.A. __ [Comment Response 82].

That refusal is independently fatal to the Final Rule.  This Court will "overturn a rulemaking as arbitrary and capricious where the EPA has failed to respond to specific challenges that are sufficiently central to its decision."  *Int'l Fabricare Inst.* v. *EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992).  Daimler's comment was just such a "specific challenge."  It pointed out that Navistar's transition could not involve substantial work—"significant modification of existing technology * * * to bring the vehicle or engine into compliance," 40 C.F.R. § 86.1103-87(b) (2012)—because Navistar had publicly bragged that it would be able to "seamlessly" integrate SCR into its engines and vehicles.  J.A. __ [DTNA July cmt. 2].  Yet it was a challenge EPA never responded to or even acknowledged.

Of course, even if EPA responded to Daimler's comment on the merits, that would not spare EPA's substantial-work finding from vacatur.  Although Daimler kept abreast of Navistar's compliance strategy and was nimble enough to attempt to comment when Navistar switched, the general public is not held to such an exacting standard.  " 'Under the standards of the APA, notice necessarily must

come—if at all—from the agency.' " *Horsehead Resource Dev. Co.*, 16 F.3d at 1268 (citation omitted). When EPA decided to completely change the basis for its substantial-work finding, it was required to notify the public and accept new comments on the change. But in its rush to push through a final NCP rule for Navistar, EPA skipped that important procedural step. Accordingly, this Court should vacate the Final Rule.

## II. THERE IS NO TECHNOLOGICAL LAGGARD.

Even if EPA could overcome the notice problems plaguing its substantial-work finding, the Final Rule should still be vacated because the Agency has not demonstrated that Navistar is a technological laggard. EPA defines "technological laggard" as "a manufacturer who cannot meet a particular emission standard due to technological (*not economic*) difficulties and who, in the absence of NCPs, might be forced from the marketplace." 67 Fed. Reg. at 51,465 (emphasis added); 61 Fed. Reg. 6944, 6950 (Feb. 23, 1996). And in separating technological from economic laggards, EPA has explained that there is *not* likely to be a technological laggard when "compliance with a standard * * * involve[s] merely the transference of technology from a similar application." 50 Fed. Reg. at 9206.

That is precisely the case here. SCR is a well-established technology, to the point that Navistar's own general counsel has characterized it as "off the shelf." J.A. __ [NCP Hearing Tr. 44]. For Navistar to comply with the 0.20 g/bhp-hr $NO_x$

standard, then, it only needs to transfer SCR technology from similar applications in other heavy heavy-duty diesel engines to its U.S. vehicles—either by purchasing the technology from a competitor or by transferring it from its own heavy heavy-duty diesel engines sold outside the U.S. As a result, Navistar, by definition, cannot be a technological laggard. *See* 50 Fed. Reg. at 9206.

The Final Rule has nothing to say about this straight-forward syllogism. Instead, it argues—at length—that Navistar must be a technological laggard because its inability to certify a 0.20 g/bhp-hr engine stemmed from its engineering difficulties with its EGR-only solution. J.A. __ [77 FR 54,390-91]. But even if Navistar's EGR-only engine failed because of technical problems, that still does not explain how Navistar's transition to SCR is not the "transference of technology from a similar application." 50 Fed. Reg. at 9206. EPA's failure to reconcile Navistar's current circumstances with its past pronouncement regarding transfers of technology renders the Agency's technological-laggard finding arbitrary and capricious. *See Ramaprakash*, 346 F.3d at 1125 (agency's reasoning is arbitrary and capricious if does not "come to grips with conflicting precedent").

What's more, the Final Rule never explains how Navistar can be a "technological" laggard when the record—to say nothing of this Court's decision in *Mack Trucks*—shows that Navistar made a calculated business decision to spurn SCR in order to pursue what it saw as the economic benefits of EGR-only engines.

J.A. __ [Cummins cmt. 3-4; Daimler cmt. 6]. In fact, in the Final Rule, EPA explicitly agreed that "Navistar * * * could have chosen the same SCR technology path as other manufacturers some time ago, and presumably could have already achieved compliance." J.A. __ [77 FR 54,391]. Given that, EPA should have found that Navistar is not a technological laggard. As this Court has recognized, "NCPs are not designed to bail out manufacturers that voluntarily choose, for whatever reason, not to adopt an existing, compliant technology." *Mack Trucks*, 682 F.2d at 95.

Indeed, EPA "agreed" with the Court's statement as a "general concept[]," but found it "do[es] not apply in this case." J.A. __ [77 FR 54,391]. Yet EPA's two interrelated reasons for why the general concept does not apply do not satisfy the APA's demand that the Agency give a " 'rational explanation' " for the distinctions it makes. *Williams Gas Processing-Gulf Coast Co.* v. *FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (citation omitted).

First, EPA asserted that Navistar is a technological laggard because its inability to make its engines compliant before its few remaining credits run out is an engineering—not economic—problem. J.A. __ [77 FR 54,390]. But EPA's analysis completely ignores Navistar's business decisions that preceded that inability. As this Court observed in *Mack Trucks*, Navistar "bet on finding a way to make [EGR] a feasible and compliant strategy before its finite supply of credits

ran out." 682 F.3d at 89. That is, rather than begin the switch to SCR when it had

sufficient credits to make the transition, Navistar decided to wait until its credits

were almost exhausted and seek NCPs to save itself from the natural consequences

of its own poor business judgment. That was a business choice (albeit a bad one in

hindsight), not an engineering difficulty, and it disqualifies Navistar from claiming

that it is a technological laggard now.

Second, EPA claimed that its technological-laggard finding was consistent

with the technological-laggard finding it made in the 2002 NCP rulemaking. J.A.

__ [77 FR 54,393]. According to EPA, Navistar's need for NCPs was similar to

the situation Caterpillar faced in 2002. *Id.* As EPA characterized the 2002

rulemaking, it was one where most manufacturers had used one emissions-control

technology, "cooled EGR," to achieve emissions compliance, and one outlier,

Caterpillar, pursued an alternative, "ACERT." *Id.* According to EPA, Caterpillar

could have used cooled EGR to achieve emissions compliance, but was allowed

NCPs to finish off its ACERT program, just as Navistar was here. *Id.*

EPA's current reading of the 2002 NCP rulemaking is revisionist history.

For starters, neither the proposed nor final rules from that rulemaking even

mention Caterpillar or ACERT in making their technological-laggard findings. 67

Fed. Reg. 2159, 2161 (Jan. 6, 2002) (proposed rule); 67 Fed. Reg. at 51,466-67

(final rule). But more importantly, in 2002, unlike now, both cooled EGR *and*

ACERT were unproven technologies. EPA explained in the Technical Support Document accompanying the 2002 NCP final rule that although cooled EGR was a technological path most manufacturers were pursuing, its success was still in doubt. *See* J.A. __ [2002 NCP Final TSD 15]. That uncertainty led EPA to credit manufacturers' claims that a technological laggard might develop because their cooled EGR development projects might not be completed when the standard went into effect—particularly for certain, low-volume engines. 67 Fed. Reg. at 51,466-67.

The upshot: EPA's suggestion that cooled EGR in 2002 was just like SCR in 2012 just isn't true. SCR in 2012 is a proven, certified, off-the-shelf technology used by every manufacturer except Navistar. J.A. __ [Volvo cmt. 8]. Cooled EGR in 2002 was a work-in-progress with an uncertain likelihood of success. The two circumstances are not analogous, and the 2002 rulemaking cannot justify EPA's technical-laggard finding in the Final Rule.

## III. EPA's NCP CALCULATION DEPARTED FROM PAST AGENCY PRACTICE WITHOUT RATIONAL EXPLANATION.

Finally, even if EPA properly determined that its availability criteria had been satisfied, the Final Rule should be vacated because it adopted an unprecedentedly low penalty amount. EPA conceded in the proposed rule that it was proposing a method for calculating the NCP that "differs * * * from that used in previous NCP rules." J.A. __ [77 FR 4740]. That methodological switch

triggered an important rule of administrative law: Having decided to deviate from past practice, EPA was obligated to "provide an adequate explanation for its departure." *Dillmon* v. *NTSB*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009). EPA's justification in the Final Rule for its new approach wilts under arbitrary-and-capricious review.

In the past, EPA's NCP rule measured compliant manufacturers' *entire* costs of compliance to move from the old standard to the new standard. J.A. __ [DTNA cmt. 9]. That approach honored what EPA had previously described as the "paramount" purpose of the NCP statute: "protecting the compliant manufacturer[s]." 67 Fed. Reg. at 2169. That's because EPA's total-costs approach ensured that the noncompliant manufacturer paid an NCP equal to the per-engine compliance costs of the conforming manufacturer with the most expensive compliance program. *See* 50 Fed. Reg. at 35,382 (explaining that EPA sets NCP for engines emitting at the upper limit equal to the incremental compliance costs of the worst-case compliant manufacturer). Put a different way, EPA's previous approach to the NCP calculations "remove[d] any competitive disadvantage to" compliant manufacturers, 42 U.S.C. § 7525(g)(3)(E), by requiring the noncompliant manufacturer to pay an NCP that built in compliant manufacturers' total development and hardware costs.

If EPA had applied its decades of past practice to the Final Rule, it would

have measured the costs of compliance that conforming manufacturers incurred to reduce their engines' emissions from 1.2 g/bhp-hr—the most recent $NO_x$ standard—to 0.20 g/bhp-hr—the current $NO_x$ standard. But it did not. Instead, EPA's Final Rule NCP gave Navistar credit for years' worth of SCR research and development. It did so by falsely *assuming* that Navistar had already certified an SCR engine that could achieve 0.50 g/bhp-hr. EPA then further assumed what a hypothetical manufacturer's costs of compliance would have been to move from that point to the current 0.20 g/bhp-hr $NO_x$ standard. J.A. __ [77 FR 4743].

There is a glaring problem with this new novel method for measuring compliance costs: It completely ignores the hundreds of millions of dollars compliant manufacturers spent researching and developing SCR technology to reduce their engines' $NO_x$ emissions from 1.2 g/bhp-hr to 0.50 g/bhp-hr—costs that included the adaptation of SCR technology for the North American market and its integration into compliant manufacturers' engines. J.A. __ [DTNA cmt. 10]. EPA did not even attempt to claim otherwise; the proposed rule admitted that the Agency's new methodology did not take into account the "significant cost of the SCR hardware itself" or "significant fixed costs for research and development" of SCR technology. J.A. __ [77 FR 4740, 4743].

Not only is EPA's new approach completely at odds with more than a decade of agency past practice, but it also contradicts EPA's newly minted theory

that the substantial-work determination must be made at the time a new emission standard is adopted, not when an NCP is sought. EPA, on one hand, ignores the availability of off-the-shelf technology for purposes of providing Navistar NCPs, but then on the other hand points directly to the availability of off-the-shelf technology when setting the NCPs' costs. Bedrock APA principles foreclose EPA from "stak[ing] out an internally inconsistent and thus untenable position" like this. *OXY USA, Inc.* v. *FERC*, 64 F.3d 679, 701 (D.C. Cir. 1995); *see Gen. Chem. Corp.* v. *United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (finding agency action arbitrary and capricious because it was "internally inconsistent and inadequately explained").

To be clear:  The fatal flaw with EPA's new approach is not necessarily that it repudiated more than a decade of consistent Agency practice; there are times when an agency may " 'alter its past rulings and practices.' " *Airmark* v. *FAA*, 758 F.2d 685, 691-692 (D.C. Cir. 1985) (citation omitted).  The flaw instead was that EPA radically changed course without doing what the APA demands:  " 'supply a reasoned analysis' " for the switch.  *Id.*  (citation omitted).  By insisting on a "reasoned analysis" for an agency's about-face, this Court ensures the agency's " 'prior policies and standards are being deliberately changed, not casually ignored.' " *Id.* at 692 (quoting *Greater Boston Television Corp.* v. *FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

EPA never provided that reasoned analysis. Its sole rationale for truncating the compliance costs it considered was that its codified NCP formula required it to do so. J.A. __ [Comment Response 36] (citing 40 C.F.R. § 86.1113-87(a)(4)). But that is just administrative sleight of hand. To be sure, the NCP formula provides that the costs of compliance should be measured from the upper limit to the new standard. But that's because, when the generic rule was adopted in 1985 and in every NCP rulemaking since, the upper limit has always been the previous emissions standard. *See* 40 C.F.R. § 86.1104-91(a) (2012). That symmetry ensured that NCPs captured the total costs compliant manufacturers incurred in getting from one technological plateau to the next. The only reason EPA calibrated the upper limit at 0.50 g/bhp-hr here was because all manufacturers— even Navistar—had been able to produce engines by 2011 that could comply with that standard. So in this rare situation—where EPA was introducing a late-breaking NCP to cater to the idiosyncratic needs of a single manufacturer—it made sense to pick an upper limit that was lower than the previous emissions standard.

But that quirk does not mean that EPA may ignore all the costs that compliant manufacturers actually incurred in developing the SCR technology that got emissions down from the previous standard to the new, more onerous standard. Yet under EPA's methodology, Navistar is credited—free of charge—with all the up-front R&D that got compliant manufacturers' SCR engines from 1.2 g/bhp-hr to

0.50 g/bhp-hr, leaving Navistar with just the tab for reducing the final 0.30 g/bhp-hr.

That result defies not only the structure and purpose of the NCP regime that Congress fashioned, but also how things work in the real world.  Imagine, for example, two private companies vying to launch a plane into space.  One invests a hundred million dollars in rocket technology, while the other—believing it will gain a competitive advantage—invests the same amount in developing a super-efficient propeller technology.  After nine years, the rocket-based technology successfully reaches orbital spaceflight, but the propeller-based technology can still make it only 60 percent of the way there.  If that unsuccessful company realizes that it must abandon propellers and adopt rocket technology, it would need to incur *all* the R&D costs in that new technology from the ground up.  But in EPA's counter-factual world, that company could be assumed to have already built a rocket engine that had achieved 60 percent of the mission and thus need only invest the marginal amounts to get a rocket to go from that point to full orbital flight.

That makes no sense.  And EPA barely pretended otherwise in the Final Rule.  All it mustered was a bare assertion that its old total-costs approach that commenters urged the Agency to adhere to was "not inherently more rational than EPA determining NCPs based on [EPA's] view of what a 0.20 g/bhp-hr engine

would cost compared to an optimized 0.50 g/bhp-hr engine." J.A. __ [Comment Response 37-38]. That response is not only not true—for the reasons we've described above, *supra* 44-47—but, more importantly, is not an explanation at all. This Court cannot accept EPA's "baffling mixture of tautology and *ipse dixit*" in lieu of rational explanation. *ARCO Oil & Gas Co.* v. *FERC*, 932 F.2d 1501, 1503 (D.C. Cir. 1991). And although EPA will doubtlessly plead deference, "[e]ven [this Court's] highly deferential standard of review requires more than [EPA] offers." *D&F Afonso Realty Trust* v. *Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000). This Court should vacate the Final Rule and remand.

## CONCLUSION

For the foregoing reasons, the petition for review should be granted and the Final Rule vacated.

Respectfully submitted,

/s/ Julie R. Domike
JULIE R. DOMIKE
WILLIAM F. LANE
ALEC C. ZACAROLI
KILPATRICK TOWNSEND & STOCKTON
   LLP
Suite 900
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 824-1418

*Counsel for Mack Trucks, Inc. and Volvo Group North America, LLC*

/s/ Christopher T. Handman
CHRISTOPHER T. HANDMAN
R. LATANE MONTAGUE
SEAN MAROTTA
KATHRYN L. LANNON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5719

*Counsel for Daimler Trucks North America LLC and Detroit Diesel Corporation*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 10,982 words.

/s/ Christopher T. Handman
Christopher T. Handman

# ADDENDA

# TABLE OF CONTENTS

Page

**Statutes:**

42 U.S.C. § 7525 ...................................................................................A1

42 U.S.C. § 7607 ...................................................................................A9

5 U.S.C. § 553 ....................................................................................A20

**Regulations:**

40 C.F.R. § 86.1103-87 (2012) ..........................................................A22

40 C.F.R. § 86.1103-87 (as amended by 77 Fed. Reg. 54,384 (Sept. 5, 2012)) .............................................................................................A23

40 C.F.R. § 86.1104-91 (2012) ..........................................................A24

40 C.F.R. § 86.1104-91 (as amended by 77 Fed. Reg. 54,384 (Sept. 5, 2012)) .............................................................................................A25

40 C.F.R. § 86.1113-87 ......................................................................A26

**Standing Declarations:**

Declaration of David Kayes, Executive Engineer for Daimler Trucks North America LLC and Detroit Diesel Corporation .............................................A31

Declaration of Anthony Greszler, Vice President, Government and Industry Relations for Volvo Powertrain .................................................................A34

# PERTINENT STATUTES AND REGULATIONS

**42 U.S.C. § 7525.  Motor Vehicle and Motor Vehicle Engine Compliance Testing and Certification**

(a) Testing and issuance of certificate of conformity

(1) The Administrator shall test, or require to be tested in such manner as he deems appropriate, any new motor vehicle or new motor vehicle engine submitted by a manufacturer to determine whether such vehicle or engine conforms with the regulations prescribed under section 7521 of this title. If such vehicle or engine conforms to such regulations, the Administrator shall issue a certificate of conformity upon such terms, and for such period (not in excess of one year), as he may prescribe. In the case of any original equipment manufacturer (as defined by the Administrator in regulations promulgated before November 15, 1990) of vehicles or vehicle engines whose projected sales in the United States for any model year (as determined by the Administrator) will not exceed 300, the Administrator shall not require, for purposes of determining compliance with regulations under section 7521 of this title for the useful life of the vehicle or engine, operation of any vehicle or engine manufactured during such model year for more than 5,000 miles or 160 hours, respectively, unless the Administrator, by regulation, prescribes otherwise. The Administrator shall apply any adjustment factors that the Administrator deems appropriate to assure that each vehicle or engine will comply during its useful life (as determined under section 7521 (d) of this title) with the regulations prescribed under section 7521 of this title.

(2) The Administrator shall test any emission control system incorporated in a motor vehicle or motor vehicle engine submitted to him by any person, in order to determine whether such system enables such vehicle or engine to conform to the standards required to be prescribed under section 7521 (b) of this title. If the Administrator finds on the basis of such tests that such vehicle or engine conforms to such standards, the Administrator shall issue a verification of compliance with emission standards for such system when incorporated in vehicles of a class of which the tested vehicle is representative. He shall inform manufacturers and the National Academy of Sciences, and make available to the

public, the results of such tests. Tests under this paragraph shall be conducted under such terms and conditions (including requirements for preliminary testing by qualified independent laboratories) as the Administrator may prescribe by regulations.

(3)

(A) A certificate of conformity may be issued under this section only if the Administrator determines that the manufacturer (or in the case of a vehicle or engine for import, any person) has established to the satisfaction of the Administrator that any emission control device, system, or element of design installed on, or incorporated in, such vehicle or engine conforms to applicable requirements of section 7521 (a)(4) of this title.

(B) The Administrator may conduct such tests and may require the manufacturer (or any such person) to conduct such tests and provide such information as is necessary to carry out subparagraph (A) of this paragraph. Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system, device, or element of design if such pollutant was not emitted, or was emitted in significantly lesser amounts, from the vehicle or engine without use of the system, device, or element of design.

(4)

(A) Not later than 12 months after November 15, 1990, the Administrator shall revise the regulations promulgated under this subsection to add test procedures capable of determining whether model year 1994 and later model year light-duty vehicles and light-duty trucks, when properly maintained and used, will pass the inspection methods and procedures established under section 7541 (b) of this title for that model year, under conditions reasonably likely to be encountered in the conduct of inspection and maintenance programs, but which those programs cannot reasonably influence or control. The conditions shall include fuel characteristics, ambient temperature, and short (30 minutes or less) waiting periods before tests are conducted. The Administrator shall not grant a certificate of conformity under this subsection for any 1994 or later model year

vehicle or engine that the Administrator concludes cannot pass the test procedures established under this paragraph.

(B) From time to time, the Administrator may revise the regulations promulgated under subparagraph (A), as the Administrator deems appropriate.

(b) Testing procedures; hearing; judicial review; additional evidence

(1) In order to determine whether new motor vehicles or new motor vehicle engines being manufactured by a manufacturer do in fact conform with the regulations with respect to which the certificate of conformity was issued, the Administrator is authorized to test such vehicles or engines. Such tests may be conducted by the Administrator directly or, in accordance with conditions specified by the Administrator, by the manufacturer.

(2)

    (A)

        (i) If, based on tests conducted under paragraph (1) on a sample of new vehicles or engines covered by a certificate of conformity, the Administrator determines that all or part of the vehicles or engines so covered do not conform with the regulations with respect to which the certificate of conformity was issued and with the requirements of section 7521 (a)(4) of this title, he may suspend or revoke such certificate in whole or in part, and shall so notify the manufacturer. Such suspension or revocation shall apply in the case of any new motor vehicles or new motor vehicle engines manufactured after the date of such notification (or manufactured before such date if still in the hands of the manufacturer), and shall apply until such time as the Administrator finds that vehicles and engines manufactured by the manufacturer do conform to such regulations and requirements. If, during any period of suspension or revocation, the Administrator finds that a vehicle or engine actually conforms to such regulations and requirements, he shall issue a certificate of conformity applicable to such vehicle or engine.

(ii) If, based on tests conducted under paragraph (1) on any new vehicle or engine, the Administrator determines that such vehicle or engine does not conform with such regulations and requirements, he may suspend or revoke such certificate insofar as it applies to such vehicle or engine until such time as he finds such vehicle or engine actually so conforms with such regulations and requirements, and he shall so notify the manufacturer.

(B)

(i) At the request of any manufacturer the Administrator shall grant such manufacturer a hearing as to whether the tests have been properly conducted or any sampling methods have been properly applied, and make a determination on the record with respect to any suspension or revocation under subparagraph (A); but suspension or revocation under subparagraph (A) shall not be stayed by reason of such hearing.

(ii) In any case of actual controversy as to the validity of any determination under clause (i), the manufacturer may at any time prior to the 60th day after such determination is made file a petition with the United States court of appeals for the circuit wherein such manufacturer resides or has his principal place of business for a judicial review of such determination. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administrator or other officer designated by him for that purpose. The Administrator thereupon shall file in the court the record of the proceedings on which the Administrator based his determination, as provided in section 2112 of title 28.

(iii) If the petitioner applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his

recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(iv) Upon the filing of the petition referred to in clause (ii), the court shall have jurisdiction to review the order in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter.

(c) Inspection

For purposes of enforcement of this section, officers or employees duly designated by the Administrator, upon presenting appropriate credentials to the manufacturer or person in charge, are authorized

(1) to enter, at reasonable times, any plant or other establishment of such manufacturer, for the purpose of conducting tests of vehicles or engines in the hands of the manufacturer, or

(2) to inspect, at reasonable times, records, files, papers, processes, controls, and facilities used by such manufacturer in conducting tests under regulations of the Administrator. Each such inspection shall be commenced and completed with reasonable promptness.

(d) Rules and regulations

The Administrator shall by regulation establish methods and procedures for making tests under this section.

(e) Publication of test results

The Administrator shall make available to the public the results of his tests of any motor vehicle or motor vehicle engine submitted by a manufacturer under subsection (a) of this section as promptly as possible after December 31, 1970, and at the beginning of each model year which begins thereafter. Such results shall be described in such nontechnical manner as will reasonably disclose to prospective ultimate purchasers of new motor vehicles and new motor vehicle engines the

comparative performance of the vehicles and engines tested in meeting the standards prescribed under section 7521 of this title.

(f) High altitude regulations

All light duty vehicles and engines manufactured during or after model year 1984 and all light-duty trucks manufactured during or after model year 1995 shall comply with the requirements of section 7521 of this title regardless of the altitude at which they are sold.

(g) Nonconformance penalty

(1) In the case of any class or category of heavy-duty vehicles or engines to which a standard promulgated under section 7521 (a) of this title applies, except as provided in paragraph (2), a certificate of conformity shall be issued under subsection (a) of this section and shall not be suspended or revoked under subsection (b) of this section for such vehicles or engines manufactured by a manufacturer notwithstanding the failure of such vehicles or engines to meet such standard if such manufacturer pays a nonconformance penalty as provided under regulations promulgated by the Administrator after notice and opportunity for public hearing. In the case of motorcycles to which such a standard applies, such a certificate may be issued notwithstanding such failure if the manufacturer pays such a penalty.

(2) No certificate of conformity may be issued under paragraph (1) with respect to any class or category of vehicle or engine if the degree by which the manufacturer fails to meet any standard promulgated under section 7521 (a) of this title with respect to such class or category exceeds the percentage determined under regulations promulgated by the Administrator to be practicable. Such regulations shall require such testing of vehicles or engines being produced as may be necessary to determine the percentage of the classes or categories of vehicles or engines which are not in compliance with the regulations with respect to which a certificate of conformity was issued and shall be promulgated not later than one year after August 7, 1977.

(3) The regulations promulgated under paragraph (1) shall, not later than one year after August 7, 1977, provide for nonconformance penalties in amounts determined under a formula established by the Administrator. Such penalties under such formula—

  (A) may vary from pollutant-to-pollutant;

  (B) may vary by class or category or vehicle or engine;

  (C) shall take into account the extent to which actual emissions of any air pollutant exceed allowable emissions under the standards promulgated under section 7521 of this title;

  (D) shall be increased periodically in order to create incentives for the development of production vehicles or engines which achieve the required degree of emission reduction; and

  (E) shall remove any competitive disadvantage to manufacturers whose engines or vehicles achieve the required degree of emission reduction (including any such disadvantage arising from the application of paragraph (4)).

(4) In any case in which a certificate of conformity has been issued under this subsection, any warranty required under section 7541 (b)(2) of this title and any action under section 7541 (c) of this title shall be required to be effective only for the emission levels which the Administrator determines that such certificate was issued and not for the emission levels required under the applicable standard.

(5) The authorities of section 7542 (a) of this title shall apply, subject to the conditions of section 7542 (b) of this title, for purposes of this subsection.

(h) Review and revision of regulations

Within 18 months after November 15, 1990, the Administrator shall review and revise as necessary the regulations under subsection (a) and (b) of this section regarding the testing of motor vehicles and motor vehicle engines to insure that vehicles are tested under circumstances which reflect the actual current driving conditions under which motor vehicles are used, including conditions relating to fuel, temperature, acceleration, and altitude.

42 U.S.C. § 7607.  Administrative Proceedings and Judicial Review

(a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410 (f) of this title, or for purposes of obtaining information under section 7521 (b)(4) or 7545 (c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title), the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521 (c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title, any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521 (b)(1) of this title), any determination under section 7521 (b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411 (d) of this title, any order under section 7411 (j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10 (c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414 (a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within

which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

(c) Additional evidence

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(d) Rulemaking

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410 (c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412 (d) of

this title, any standard under section 7412 (f) of this title, or any regulation under section 7412 (g)(1)(D) and (F) of this title, or any regulation under section 7412 (m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521 (a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b (e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413 (d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b (f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553 (b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

   (A) the factual data on which the proposed rule is based;

   (B) the methodology used in obtaining the data and in analyzing the data; and

   (C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409 (d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

   (4)

   (A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed

rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)

(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies

(i) the Administrator shall allow any person to submit written comments, data, or documentary information;

(ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions;

(iii) a transcript shall be kept of any oral presentation; and

(iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)

(A) The promulgated rule shall be accompanied by

(i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and

(ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)

(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing)

may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if

    (i) such failure to observe such procedure is arbitrary or capricious,

    (ii) the requirement of paragraph (7)(B) has been met, and

    (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

(e) Other methods of judicial review not authorized

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

(f) Costs

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall

grant any stay, injunctive, or similar relief before final judgment by such court in such action.

(h) Public participation

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

**5 U.S.C. § 553. Rulemaking**

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

   (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

   (2) interpretative rules and statements of policy; or

   (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

**40 C.F.R. § 86.1103-87. Criteria for Availability of Nonconformance Penalties**

(a) EPA shall establish for each subclass of heavy-duty engines and heavy-duty vehicles (other than motorcycles), an NCP for a motor vehicle pollutant, when any new or revised emission standard is more stringent than the previous standard for the pollutant, or when an existing standard for that pollutant becomes more difficult to achieve because of a new or revised standard, provided that EPA finds:

  (1) That for such subclass of engines or vehicles, substantial work will be required to meet the standard for which the NCP is offered, and

  (2) That there is likely to be a technological laggard.

(b) Substantial work, as used in paragraph (a)(1) of this section, means the application of technology not previously used in an engine or vehicle class or subclass, or the significant modification of existing technology or design parameters, needed to bring the vehicle or engine into compliance with either the more stringent new or revised standard or an existing standard which becomes more difficult to achieve because of a new or revised standard.

**40 C.F.R. § 86.1103-87 (as amended by 77 Fed. Reg. 54,384 (Sept. 5, 2012))**

**40 C.F.R. § 86.1103-87. Criteria for Availability of Nonconformance Penalties**

(a) EPA shall establish for each subclass of heavy-duty engines and heavy-duty vehicles (other than motorcycles), an NCP for a motor vehicle pollutant, when any new or revised emission standard is more stringent than the previous standard for the pollutant, or when an existing standard for that pollutant becomes more difficult to achieve because of a new or revised standard, provided that EPA finds:

 (1) That for such subclass of engines or vehicles, substantial work is required to meet the standard for which the NCP is offered, and

 (2) That there is likely to be a technological laggard.

(b) Substantial work, as used in paragraph (a)(1) of this section, means the application of technology that was not generally used in an engine or vehicle class or subclass to meet standards prior to the implementation of the new or revised standard, or the significant modification of existing technology or design parameters, needed to bring the vehicle or engine into compliance with either the more stringent new or revised standard or an existing standard which becomes more difficult to achieve because of a new or revised standard. Substantial work is determined by the total amount of work required to meet the standard for which the NCP is offered, compared to the previous standard, irrespective of when EPA establishes the NCP.

**40 C.F.R. § 86.1104-91.  Determination of Upper Limits.**

(a) The upper limit applicable to a pollutant emission standard for a subclass of heavy-duty engines or heavy-duty vehicles for which an NCP is established in accordance with § 86.1103-87, shall be the previous pollutant emission standard for that subclass.

(b) If no previous standard existed for the pollutant under paragraph (a) of this section, the upper limit will be developed by EPA during rulemaking.

(c) If a manufacturer participates in any of the emissions averaging, trading, or banking programs, and carries over certification of an engine family from the prior model year, the upper limit for that engine family shall be the family emission limit of the prior model year, unless the family emission limit is less than the upper limit determined in paragraph (a) of this section.

**40 C.F.R. § 86.1103-87 (as amended by 77 Fed. Reg. 54,384 (Sept. 5, 2012))**

**40 C.F.R. § 86.1103-87. Criteria for Availability of Nonconformance Penalties**

(a) EPA shall establish for each subclass of heavy-duty engines and heavy-duty vehicles (other than motorcycles), an NCP for a motor vehicle pollutant, when any new or revised emission standard is more stringent than the previous standard for the pollutant, or when an existing standard for that pollutant becomes more difficult to achieve because of a new or revised standard, provided that EPA finds:

 (1) That for such subclass of engines or vehicles, substantial work is required to meet the standard for which the NCP is offered, and

 (2) That there is likely to be a technological laggard.

(b) Substantial work, as used in paragraph (a)(1) of this section, means the application of technology that was not generally used in an engine or vehicle class or subclass to meet standards prior to the implementation of the new or revised standard, or the significant modification of existing technology or design parameters, needed to bring the vehicle or engine into compliance with either the more stringent new or revised standard or an existing standard which becomes more difficult to achieve because of a new or revised standard. Substantial work is determined by the total amount of work required to meet the standard for which the NCP is offered, compared to the previous standard, irrespective of when EPA establishes the NCP.

(i) Test engine or vehicle description, including;

(A) Configuration and engine family identification,

(B) Year, make and build date,

(C) Engine or vehicle identification number, and

(D) Number of hours of service accumulated on engine or number of miles on vehicle prior to testing;

(ii) Location where service or mileage accumulation was conducted and description of accumulation procedure and schedule;

(iii) Test number, date, initial test results before and after rounding, final test results and final deteriorated test results for all emission tests, whether valid or invalid, and the reason for invalidation, if applicable;

(iv) A complete description of any modification, repair, preparation, maintenance, and/or testing which was performed on the test engine or vehicle and has not been reported pursuant to any other paragraph of this subpart and will not be performed on all other production engines or vehicles; and

(v) Any other information the Administrator may request relevant to the determination as to whether the new heavy-duty engines or heavy-duty vehicles being manufactured by the manufacturer do in fact conform with the regulations of this subpart; and

(6) The following statement and endorsement:

This report is submitted pursuant to section 206 of the Clean Air Act. This Production Compliance Audit was conducted in complete conformance with all applicable regulations under 40 CFR part 86 et seq. All data and information reported herein is, to the best of

(Company Name)_____'s
knowledge, true and accurate. I am aware of the penalties associated with violations of the Clean Air Act and the regulations thereunder.

_____
(Authorized Company Representative)

### §86.1113–87 Calculation and payment of penalty.

(a) The NCP for each engine or vehicle for which a compliance level has been determined under §86.1112–87 is calculated according to the formula in paragraph (a)(1) or (a)(2) of this section depending on the value of the compliance level. Each formula contains an annual adjustment factor ($AAF_i$) which is defined in paragraph (a)(3) of this section. Other terms in the formulas are defined in paragraph (a)(4) of this section.

(1) If the compliance level (CL) is greater than the standard and less than or equal to X (e.g., point $CL_1$ in figure 1), then:

$$NCP_n = (PR_1)(CL - S)\left(\prod_{i=1}^{n} AAF_i\right)$$

where:

$PR_1 = (F)(MC_{50})$

(2) If the compliance level is greater than X and less than or equal to the upper limit as determined by §86.1104–87 (e.g., point $CL_2$ in figure 1), then:

$$NCP_n = (COC_{50} + (PR_2)(CL - X))\left(\prod_{i=1}^{n} AAF_i\right)$$

where:

$$PR_2 = \frac{COC_{90} - COC_{50}}{UL - X}$$

(3) $AAF_i$ has the following values:

(i) If $frac_{i-1} = 0$, then $AAF_i = 1 + I_{i-1}$

(ii) If $frac_{i-1} > 0$, then:

$$AAF_i = 1 + I_{i-1} + A_i\left[\frac{1}{1 - frac_{i-1}}\right]^i$$

Figure 1

Penalty vs. Compliance Level



Compliance Level (CL)

If $frac_{i-1} > 0.50$, then $frac_{i-1}$ will be set equal to 0.50.

(iii) $AAF_i = 1$

(iv) In calculating the NCP for year n, the value $frac_{i-1}$ for i=n will include actual NCP usage through March 31 of model year n–1 and EPA's estimate of additional usage for the remainder of model year n–1 using manufacturer input. All manufacturers using NCPs must report by subclass actual NCP and non-NCP production numbers through March 31, an estimate of NCP and non-NCP production for the remainder of the model year, and the previous year's actual NCP and non-NCP production to EPA no later than April 30 of the model year. If EPA is unable to obtain similar information from manufacturers not using NCPs, EPA will use projected sales data from the manufacturers' application for certification in computing the total production of the subclass and the $frac_{i-1}$. The value of $frac_{i-1}$ will be corrected to reflect actual year-end usage of NCPs and a corrected AAF will be used to establish NCPs in future years. The cor-

rection of previous year's AAF will not affect the previous year's penalty.

(4) The terms in the above formulas have the following meanings and values, which may be determined separately for each subclass and pollutant for which an NCP is offered. The production of Federal and California designated engines or vehicles shall be combined for the purpose of this section in calculating the NCP for each engine or vehicle.

$NCP_n$ = NCP for year n for each applicable engine or vehicle

CL = Compliance level for year n for applicable engines or vehicles

S = Emission standard

UL = Upper limit as determined by section 86.1104–87, except that, if the upper limit is determined by section 86.1104–87(c), the value of UL in paragraph (a)(2) of this section shall be the prior emission standard for that pollutant.

UL′ = Upper limit as determined by section 86.1104–87(c). This value is not used in the above formulas.

X = Compliance level above the standard at which $NCP_1$ equals $COC_{50}$

$$X = \frac{COC_{50}}{(F)(MC_{50})} + S$$

PR$_1$=Penalty rate when CL ≤ X
PR$_2$=Penalty rate when X < CL ≤ applicable upper limit

$$\prod_{i=1}^{n} AAF_i = \text{Running product, i.e., } (AAF_1) \times (AAF_2) \times \cdots \times (AAF_n)$$

i=An index representing a year. It represents the same year for both Federal and California designated engines or vehicles of the same production model year.

n=Index representing the number of model years for which the NCP has been available for an engine or vehicle subclass (i.e., n=1 for the first year that the NCP is available, and so on until n=n for the nth year that the NCP is available). The factor "n" is based on the model year the NCP is first available, as specified in section 86.1105–87 for the engine or vehicle subclass and pollutant for both Federal and California designated engines and vehicles.

COC$_{50}$=Estimate of the average total incremental cost to comply with the standard relative to complying with the upper limit.

COC$_{90}$=Estimate of the 90th percentile total incremental cost to comply with the standard relative to complying with the upper limit.

MC$_{50}$=Estimate of the average marginal cost of compliance (dollars per emission unit) with the standard.

F=Factor used to estimate the 90th percentile marginal cost based on the average marginal cost (the minimum value of F is 1.1, the maximum value of F is 1.3).

AAF$_i$=Annual adjustment factor for year i, frac$_{i-1}$=Fraction of engines or vehicles of a subclass using NCPs in previous year (year i-1).

A$_i$=Usage adjustment factor in year i: A$_i$=0.10 for i=2; A$_i$=0.08 for i<2.

I$_i$=Percentage increase in overall consumer price index in year i.

(5) The values of COC$_{50}$, COC$_{90}$, MC$_{50}$ and F will be determined for each applicable subclass by EPA based on the cost data used by EPA in setting the applicable emission standard. However, where the rulemaking to establish a specific NCP occurs after the rulemaking to establish the standard, EPA may augment the data base used to establish the standard by including the best cost and emission performance data available to EPA during the specific NCP rulemaking.

(6) In calculating the NCP, appropriate values of the following predefined terms should be used: CL, S, UL, F, and A$_i$. For all other terms, unrounded values of at least five figures beyond the decimal point should be used in calculations leading up to the penalty amount. Any NCP calculated under paragraph (a) of this section will be rounded to the nearest dollar in accordance with ASTM E29–67.

(b) The NCP determined in paragraph (a) of this section is assessed against all those engines or vehicles of the nonconforming configuration or engine family produced at all assembly plants and distributed into commerce—

(1) Since the beginning of the model year in the case of a certification failure described by §86.1106–87(a).

(2) Beginning ten days after an SEA failure described by §86.1106–87 (b) or (c).

(3) Following implementation of a production running change described by §86.1106–87(d).

(c) The NCP will continue to be assessed during the model year, until such time, if any, that the configuration or engine family is brought into conformance with applicable emission standards.

(d) A manufacturer may carry over an NCP from a model year to the next model year. There is no limit to the number of years that carryover can continue. The amount of the penalty will increase each year according to paragraph (a) of this section.

(e) The Administrator shall notify the manufacturer in writing of the nonconformance penalty established under paragraph (a) of this section after the completion of the PCA under §86.1112–87.

(f) A manufacturer may request a hearing under §86.1115–87 as to whether

77

the compliance level (including a compliance level in excess of the upper limit) was determined in accordance with the procedures in § 86.1112–87(a) or whether the nonconformance penalty was calculated in accordance with the procedures in § 86.1113–87(a). If a nonconformance penalty has been established, such hearing must be requested within fifteen (15) days or such other period as may be allowed by the Administrator after the notification of the nonconformance penalty. If a manufacturer wishes to challenge a compliance level in excess of the upper limit, he must request a hearing within fifteen (15) days or such other period as may be allowed by the Administrator after the completion of the Production Compliance Audit.

(g)(1) Except as provided in paragraph (g)(2) of this section, the nonconformance penalty or penalties assessed under this subpart must be paid as follows:

(i) By the quarterly due dates, i.e., within 30 days of the end of each calendar quarter (March 31, June 30, September 30 and December 31), or according to such other payment schedule as the Administrator may approve pursuant to a manufacturer's request, for all nonconforming engines or vehicles produced by a manufacturer in accordance with paragraph (b) of this section and distributed into commerce for that quarter.

(ii) The penalty shall be payable to U.S. Environmental Protection Agency, NCP Fund, P.O. Box 360277M, Pittsburgh, PA 15251.

(2) When a manufacturer has requested a hearing under § 86.1115–87, it must pay the nonconformance penalty, and any interest, within ten days after the Presiding Officer renders his decision, unless the manufacturer first files a notice of intention to appeal to the Administrator pursuant to § 86.1115–87(t)(1), or, if an appeal of the Presiding Officer's decision is taken, within ten days after the Administrator renders his decision, unless the manufacturer first files a petition for judicial review.

(3) A manufacturer making payment under paragraph (g)(1) or (g)(2) of this section shall submit the following information by each quarterly due date to: Director, Manufacturers Operations Division, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. This information shall be submitted even if a manufacturer has no NCP production in a given quarter.

(i) Corporate identification, identification and quantity of engines or vehicles subject to the NCP, certificate identification (number and date), NCP payment calculations and interest payment calculations, if applicable.

(ii) The following statement and endorsement:

> This information is submitted pursuant to section 206 of the Clean Air Act. All information reported herein is, to the best of
> _____'s
> (Company name)
> knowledge, true and accurate. I am aware of the penalties associated with violations of the Clean Air Act and the regulations thereunder.
>
> _____
> (Authorized Company Representative)

(4) The Administrator may verify the production figures or other documentation submitted under paragraph (g)(3) of this section.

(5)(i) Interest shall be assessed on any nonconformance penalty for which payment has been withheld under § 86.113–87(g) (1) or (2). Interest shall be calculated from the due date for the first quarterly NCP payment, as determined under § 86.1113–87(g)(1), until either the date on which the Presiding Officer or the Administrator renders the final decision of the Agency under § 86.1115–87 or the date when an alternate payment schedule (approved pursuant to § 86.1113–87(g)(1)) ends.

(ii) The combined principal plus interest on each quarterly NCP payment withheld pursuant to § 86.1113–87(g) (1) or (2) shall be calculated according to the formula:

$$QNCP(1 + R).25n$$

where:
QNCP=the quarterly NCP payment
R=the interest rate applicable to that quarter
n=the number of quarters for which the quarterly NCP payment is outstanding.

(iii) The number of quarters for which payment is outstanding for purposes of this paragraph shall be the number of quarterly NCP payment due

dates, as determined under §86.1113–87(g)(1), which have elapsed throughout the duration of a hearing request, or alternate payment schedule.

(iv) The interest rate applicable to a quarter for purposes of this paragraph shall be the rate published by the Secretary of the Treasury pursuant to the Debt Collection Act of 1982 and effective on the date on which the NCP payment was originally due.

(6) A manufacturer will be refunded an overpayment, or be permitted to offset an overpayment by withholding a future payment, if approved in advance by the Administrator. The government shall pay no interest on overpayments.

(h) A manufacturer that certifies as a replacement for the nonconforming configuration, a configuration that is in conformance with applicable standards, and that performs a production compliance audit (PCA) in accordance with §86.1112–87(a) that results in a compliance level below the applicable standard, will be eligible to receive a refund of a portion of the engineering and development component of the penalty. The engineering and development component will be determined by multiplying the base penalty amount by the engineering and development factor for the appropriate subclass and pollutant in §86.1105–87. The amount refunded will depend on the model year in which the certification and PCA take place. In cases where payment of penalties have been waived by EPA in accordance with paragraph (g)(1)(iii) of this section, EPA will refund a portion of the engineering and development component. The proportionate refund to be paid by EPA will be based on the proportion of vehicles or engines of the nonconforming configuration for which NCPs were paid to EPA. The refund is calculated as follows:

$R_{tot} = D_n \times F_{E\&D} \times NCP_1 \times Prod_{tot}$

$R_{Cal} = (Prod_{Cal}/Prod_{tot}) \times (R_{tot})$

$R_{EPA} = R_{tot} - R_{Cal}$

Where:

n=index representing the number of model years for which the NCP has been available for an engine or vehicle subclass (i.e., n=1 for the first year that NCPs are available, . . . , n=n for the n[th] year the NCPs are available; same as "n" in paragraph (a)(4)).

$D_n$=discount factor depending on the number of model years (n) for which NCPs were

available at the time of certification and PCA of the replacement configuration, and its value is as follows:

$D_1$=0.90

$D_2$=0.79

$D_3$=0.67

$D_4$=0.54

$D_5$=0.39

$D_6$=0.23

$D_7$=0.05

$D_n$=0.00 for n=8 or larger

$F_{E\&D}$=the engineering and development factor specified in section 86.1105–87 for the appropriate subclass and pollutant

$NCP_1$=the penalty for each engine or vehicle during the first (base) year the NCP is available as calculated in paragraph (a)

$Prod_{tot}$=total number of engines or vehicles produced in the subclass for which NCPs were paid to EPA or to the State of California

$Prod_{Cal}$=number of engines or vehicles in the subclass demonstrated to have been titled, registered or principally used in the State of California and for which NCPs were paid to the State of California under paragraph (g)(1)

$R_{tot}$=Total refund due to the manufacturer for the engineering and development component of the NCP

$R_{Cal}$=Refund due to the manufacturer from the State of California for the engineering and development component of the NCP

$R_{EPA}$=Refund due to the manufacturer from EPA for the engineering and development component of the NCP.

[50 FR 35388, Aug. 30, 1985, as amended at 50 FR 53467, Dec. 31, 1985; 53 FR 19134, May 26, 1988; 55 FR 46629, Nov. 5, 1990; 61 FR 51366, Oct. 2, 1996]

## §86.1114–87 Suspension and voiding of certificates of conformity.

(a) The certificate of conformity is suspended with respect to any engine or vehicle failing pursuant to paragraph (f) of §86.1112–87 effective from the time that a fail decision is made for that engine or vehicle.

(b) Once a certificate has been suspended for a failed engine or vehicle as provided for in paragraph (a) of this section, the manufacturer shall take the following actions:

(1) Before the certificate is reinstated for that failed engine or vehicle,

(i) Remedy the nonconformity, and

(ii) Demonstrate that the engine or vehicle conforms to the applicable standards or compliance levels by retesting the engine or vehicle in accordance with these regulations; and

# STANDING DECLARATIONS

| | |
|---|---|
| DAIMLER TRUCKS NORTH AMERICA LLC, DETROIT DIESEL CORPORATION, MACK TRUCKS, INC., and VOLVO GROUP NORTH AMERICA, LLC, | |
| Petitioners, | No. 12-1433 |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| Respondent. | |
| NAVISTAR, INC., | |
| Intervenor. | |

I, David Kayes, hereby declare:

1. I am the Executive Engineer in charge of environmental compliance within the Product Compliance and Regulatory Affairs for Daimler Trucks North America LLC (Daimler Trucks), a subsidiary of Daimler North America Corporation (Daimler North America), and Detroit Diesel Corporation (Detroit Diesel), a subsidiary of Daimler Trucks. I am responsible for emission certification and compliance issues for Daimler Trucks.

2. I have personal knowledge of the matters set forth herein.

3. Daimler Trucks manufactures heavy-duty and medium-duty trucks and specialized commercial vehicles under the brand names Western Star Trucks, Thomas Built Buses, and Freightliner.

4. Daimler Trucks was founded in 1942 and, along with its affiliated companies, employs approximately 20,000 employees. It has manufacturing

facilities across the United States, including locations in Cleveland, North Carolina; Gastonia, North Carolina; High Point, North Carolina; Mount Holly, North Carolina; Portland, Oregon; and Gaffney, South Carolina. Daimler Trucks also supports a network of approximately 2,000 sales and service support locations in North America.

5. Daimler Trucks' heavy heavy-duty vehicles are powered almost exclusively by engines that use Selective Catalytic Reduction (SCR) technology to meet EPA's NOx emissions standards. The only diesel vehicles not using SCR are some export or military vehicles, which are subject to different emission standards.

6. Detroit Diesel manufactures heavy heavy-duty diesel engines that use SCR. Founded in 1938, it employs approximately 2,300 people and serves its customers and markets primarily from its three-million square foot manufacturing plant in Redford Township, Michigan. Detroit Diesel also has remanufacturing centers in Emporia, Kansas; Grand Rapids, Michigan; Cambridge, Ohio; Hibbing, Minnesota; and Tooele, Utah.

7. The heavy heavy-duty diesel engines that are eligible for nonconformance penalties (NCPs) under the Final Rule challenged in this case are defined by EPA to include heavy-duty diesel engines used in vehicles that exceed 33,000 lbs. gross vehicle weight rating (GVWR). The U.S. Department of Transportation defines trucks that exceed 33,000 lbs. GVWR as Class 8 trucks.

8. The Class 8 truck market is extremely competitive and manufacturers' products are close substitutes for one another. As a result, even minor differences between manufacturers' products, such as the emissions reduction technology used, can lead to significant advantages in the marketplace. Daimler Trucks and Navistar often compete head-to-head for the limited number of sales available in the Class 8 market.

9. If Navistar were not able to sell its engines using the NCPs challenged in this action, Daimler Trucks would have faced fewer challenges marketing its engines and vehicles to Class 8 truck purchasers. Among other things, Daimler Trucks' sales force would have an easier time selling against Navistar's nonconforming vehicles because Navistar's vehicles would not be available for purchase or, to the extent Navistar relied on dwindling credits, far fewer vehicles would be marketed.

10. Despite receiving information from Daimler Trucks, Detroit Diesel, and other manufacturers, EPA impermissibly set the NCPs at so low a level that they created competitive disadvantages for compliant manufacturers when the Final Rule took effect on September 5, 2012.

11. Daimler Trucks and Detroit Diesel have carefully reviewed the NCPs established by the Final Rule and determined that they are too low to remove the competitive disadvantage to compliant manufacturers. The NCPs are several times lower than the actual costs of compliance incurred by Daimler Trucks and Detroit Diesel. Daimler Trucks and Detroit Diesel, and other compliant manufacturers, are therefore penalized for complying with the 2010 NOx standard.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 21, 2013.

David Kayes
_____
David Kayes

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| DAIMLER TRUCKS NORTH AMERICA LLC, *et al.*, | ) ) ) ) | |
| Petitioners, | ) ) | No. 12-1433 |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) | |
| Respondent. | ) ) ) | |

## DECLARATION OF ANTHONY GRESZLER

1.     I, Anthony Greszler, am Vice President, Government and Industry Relations for Volvo Powertrain.  I declare that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge and on information supplied to me by other employees of Mack Trucks, Inc. ("Mack") and Volvo Group North America, LLC ("Volvo").  For purposes of this Declaration, Mack and Volvo will collectively be referred to as "Mack" unless otherwise designated.

2.     In my position with Mack, I am responsible for interaction with the EPA in development of and compliance with regulations governing our products. These responsibilities include technical engineering and analysis work related to compliance with EPA emissions standards; certification of Mack engines; and interaction with EPA representatives for purposes of emissions compliance.

2

3.     Both Mack and Navistar are subject to a nitrogen oxides (NOx) emissions standard of 0.2 g/bhp-hr, which took full effect on January 1, 2010 ("2010 Standard"). Mack began delivery of heavy-duty trucks and engines that comply with the 0.2 g/bhp-hr NOx standard beginning in November 2009. Mack engines meet the 2010 Standard through use of selective catalytic reduction ("SCR") systems installed as part of every engine and vehicle.

4.     From the time Mack began delivering heavy-duty trucks and engines that meet EPA's 2010 standard to the present, Navistar has continued to sell heavy-duty trucks and engines that do not achieve the 0.2 g/bhp-hr NOx limit in the 2010 Standard. Navistar's continued sale of trucks and engines that do not achieve the 0.2 g/bhp-hr standard has put Mack at a distinct competitive disadvantage. Navistar's engines utilize exhaust gas recirculation ("EGR") only to reduce NOx emissions in truck exhaust. Unlike SCR engines, Navistar's EGR engines emit NOx at levels well above EPA's 0.2 g/bhp-hr standard.

5.     Mack expended approximately $425 million in developing and implementing engines and emissions control systems that comply fully with EPA's 0.2 g/bhp-hr NOx standard. This does not include hundreds of millions of dollars Mack spent in complying with a phase-in standard of approximately 1.2 g/bhp-hr between 2007 and 2010.

6.      On January 31, 2012, EPA issued a Proposed Rule that, upon promulgation as a final rule, would establish a nonconformance penalty amount of up to $1,919 for engines that are certified at levels between 0.2 and 0.5 g/bhp-hr. Mack submitted written comments to EPA, urging the Agency to not issue a final rule for several reasons, including the absence of a technological laggard.  Mack also informed EPA that the appropriate amount for a nonconformance penalty is $9,000 to $13,300 per engine certified at 0.5 g/bhp-hr.  This amount was based on the actual costs borne by engine manufacturers, including Mack, in developing and implementing engines and emissions control systems that comply with EPA's 0.2 g/bhp-hr standard

7.      On September 5, 2012, EPA issued a Final Rule establishing a nonconformance penalty amount of up to $3,775 for engines that are certified at levels between 0.2 and 0.5 g/bhp-hr.  Navistar will be required to pay the nonconformance penalty specified in the Final Rule for each non-compliant engine produced.

64799315V.22

8. The issuance of the Final Rule allows Navistar to gain a substantial competitive advantage through its production and sale of trucks with engines that emit NOx at levels of 0.5 g/bhp-hr, rather than at the 0.2 g/bhp-hr standard. The competitive advantage is gained through a) Navistar's ability to market and sell lower-cost engines, as it is less expensive to produce an EGR-only engine that only meets a 0.5 g/bhp-hr NOx standard than it is to produce an SCR engine that complies with the EPA mandated 0.2 g/bhp-hr NOx standard; b) Navistar's engines' ability to deliver better fuel economy at 0.5 g/bhp-hr than they could if they were meeting the 0.2 g/bhp-hr standard; and c) Navistar's ability to market the EGR-only engines without the necessary costs of ongoing consumption of diesel exhaust fluid.

9. Had Mack been given the opportunity to design a vehicle to meet a 0.5 g/bhp-hr NOx standard, it could have produced a product with improved overall performance at less cost. As a result of having to compete with Navistar while meeting a lower emission standard than that applicable to Navistar, Mack has been prevented from gaining, or even maintaining, market share. Losses associated with such lost market share are not recoverable.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: _Feb. 22, 2013_

ANTHONY GRESZLER

**CERTIFICATE OF SERVICE**

I certify that on February 22, 2012, the foregoing Initial Opening Brief For Petitioners was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users. I also certify that I caused to be delivered to the Court by messenger five copies of the brief, pursuant to Circuit Rule 31(b).

/s/ Christopher T. Handman
Christopher T. Handman
